*563 The opinion of the Supreme Court was delivered by
Mr. Justice Murphy,
with Mr. Justice Jackson dissenting. Mr. Justice Keed took no part in the consideration or decision of this case.
The opinion of the Supreme Court is as follows:
This suit to adjudicate certain claims of the Seminole Nation against the United States growing out of various treaties, agreements, and acts of Congress is now before us for the second time. After we reversed, 299 U. S. 417, for want of jurisdiction in the Court of Claims a previous judgment of that court awarding the Seminole Nation $1,317,087.27,[1] the jurisdictional barrier was removed by statute,[2] and the Seminole Nation then filed a second amended petition in the Court of Claims, reasserting the six items of claim previously denied by this Court on jurisdictional grounds.[3] The Court of Claims thereupon disallowed three items in their entirety, allowed one in full and allowed the remaining two in part, deciding that the Seminole Nation was entitled to $18,388.30, against which the United States was entitled to gratuity offsets in the amount of $705,-3 *564 37.33.[4] Accordingly, the second amended petition was ordered dismissed.[5] We granted certiorari on a petition challenging- the correctness of the decision below on each of the five items disallowed in whole or in part, and as to numerous items which the court included in its list of gratuity offsets.
I
_ We are of opinion that petitioner, the Seminole Nation, is entitled to no additional allowance on Items One, Three, and Four of its claim.

Item One.

This item is a claim for $61,563.42, based on Article VIII of the Treaty of August 7, 1856, 11 Stat. 699, 702, whereby the Government promised the Seminole Nation:
“to provide annually for ten years the sum of three thousand dollars for the support of schools; two thousand dollars for agricultural assistance; and two thousand two hundred dollars for the support of smiths and smith shops ...”
The Court of Claims found that Congress annually made the necessary appropriation of $7,200 to discharge this obligation during the fiscal years from 1858 to 1867, inclusive; that only $10,436.58 was actually expended for the purposes specified in the Treaty; and that the balance ($61,563.42) was diverted and disbursed by the Government prior to June 30, 1866, for the purpose of clothing and feeding refugee ana destitute Indians driven from their homes during the Civil War because of their loyalty to the Union.
Petitioner’s claim to the diverted balance was properly disallowed because petitioner released its claim by Article VIII of the Treaty of March 21, 1866, 14 Stat. 755, 759, which provides: ,
“The stipulations of this treaty are to be a full settlement of all claims of said Seminole nation for damages and losses of every kind growing out of the late rebellion, *565 and all expenditures by the United States of annuities in clothing and feeding refugee and destitute Indians since the diversion of annuities for that purpose, consequent upon the late war with the so-called confederate states. And the Seminóles hereby ratify and confirm all such diversions of annuities heretofore made from the funds of the Seminole nation by the United States. And the United States agree that no annuities shall be diverted from the objects for which they were originally devoted by treaty stipulations with the Seminóles, to the use of refugee and destitute Indians, other than the Seminóles or members of the Seminole nation, after the close of the present fiscal year, June thirtieth, eighteen hundred and sixty-six.”
It is unnecessary to consider petitioner’s contention that by this Article it did not ratify the diversions in question because they were made from the funds of the United States and not from funds of the Seminole Nation. The first sentence of Article VIII of Treaty of 1866, quoted above, constitutes a release to the United States of all expenditures of annuities diverted for the purpose of clothing and feeding refugee Indians. There is no requirement that the annuities there referred to must be derived “from the funds of the Seminole nation,” and there is no indication that the releases contained in the first sentence of Article VIII are dependent upon the ratification contained in the second sentence. The payments due the Seminole Nation under Article VIII of the Treaty of 1856 clearly come within the scope of the release — being annual payments, they were annuities, and they were diverted for the purpose of clothing and feeding refugee Indians.

Item Three.

This claim for $61,347.20 grows out of Article III of the Treaty of 1866 in which the Government agreed to establish a $50,000 trust fund for the Seminole Nation and to pay thereon annual interest of 5% ($2,500) for the support of schools.
During the period from 1867 to 1874 the Government only partially discharged this annual obligation, disbursing only $16,902.80 of the $20,000 appropriated for that purpose. It is here undisputed that, as the Court of Claims held, petitioner is entitled to the deficiency of $3,097.20.
The Court of Claims correctly disallowed the balance of this Item. During the twenty-three years from 1875 *566 to 1898 the annual payments, amounting in all to $57,500, were paid directly to the tribal treasurer. Since that official disbursed annually not less than $2,500 in excess of amounts he was otherwise obligated to expend for the maintenance of schools,[6] there is no need to inquire whether payment to that official was authorized. The schools actually received the benefit of the money. That satisfied the obligation of the Treaty and defeats recovery.
The remainder of this Item, $750, was paid to the United States Indian Agent for the Seminóles in 1907. Such payment was proper under Section 11 of the Act of April 26, 1906, c. 1870, 34 Stat. 137, 141,[7] and nothing in the applicable jurisdictional act[8] indicates any intention on the part of Congress to override or repeal the Act of 1906.

Item Four.

The Government agreed in Article VI of the Treaty of 1866 to construct, “at an expense not exceeding ten thousand ($10,000) dollars, suitable agency buildings” on the Seminole reservation. In 1870 and 1872, $931.76 was expended for agency buildings and repairs. Petitioner’s claims for the difference of $9,068.24 between this sum and $10,000 is without merit. In 1872 Congress appropriated $10,000 to fulfill this treaty obligation; [9] $9,030.15 of this appropriation was expended for some undisclosed purpose, as only $969.85 was returned to surplus. The Court of Claims found that an agency building was erected on the Seminole reservation in 1873.[10] Petitioner makes no claim that the building erected was unsuitable. Since the Government’s prom *567 ise was not to expend $10,000, but to erect suitable buildings at a cost not in excess of $10,000, it follows that there was no violation of the treaty provision, and hence no right of recovery.
II
With respect to Items Two and Five we are of opinion that the cause must be remanded to the Court of Claims for further material findings of fact.

Item Two.

This is a claim for $154,551.28 based on one of the provisions of Article VIII of the Treaty of 1856, namely, the Government’s promise to establish a $500,000 trust fund (originally two funds of $250,000 each), the annual interest therefrom ($25,000) to be paid over to the members of the Seminole Nation per capita as an annuity. The findings of the Court of Claims show that although Congress appropriated $25,000 annually for each of the fiscal years in controversy (1867-1898, 1907-1909), the Government did in fact fail to make direct per capita disbursements of a portion of the funds appropriated in 1867-1874, 1876, and 1879, the underpayments for those years totalling $92,051.28, and that one-half the appropriation in 1907 and the entire appropriation in 1908 and 1909 ($62,500 in all), instead of being paid directly to the individual Seminóles, was paid to the United States Indian Agent for the Seminole Nation.
The Court of Claims reduced petitioner’s claim for $154,551.28, based on these underpayments and alleged mispayments, to $13,501.10, allowing the Government three set-offs, consisting of (a) overpayments of $12,-127.54-made in 1875, 1877, 1880, 1882, and 1883; - (b) payment of $62,500 made to the United States Indian Agent for the Seminóles in 1907, 1908, and 1909; and (c) payments of $66,422.64 made pursuant to requests of the Seminole General Council during the period from 1870 to 1874.
The overpayments were rightly deducted, cf. Wisconsin Central Rd. v. United States, 164 U. S. 190, and petitioner does not contend otherwise. Nor is petitioner entitled to any part of the $62,500 paid directly to the Indian Agent, for such payments were proper under the Act of 1906, 34 Stat. 137, 141, which, as pointed out in the discussion of Item Three, ante, was not repealed by the jurisdictional act, 43 Stat. 138. *568 There is thus left for consideration only the payments from 1870 to 1874 made pursuant to requests of the Seminole General Council and totalling $66,422.64; of this amount $37,500 was paid directly to the tribal treasurer, and the remaining $28,922.64 to designated creditors.
The Government contends that since those payments were made at the request of the tribal council, the governing body of a semiautonomous political entity, possessing the power to enter into treaties and agreements with the United States, the tribe is not now entitled to receive payment a second time, and that, despite the fact that the Treaty of 1856 provided that the payments were to be made per capita for the benefit of each individual Indian, these payments at the request of the General Council discharged the treaty obligation because the agreement was one between the United States and the Seminole Nation and not one between the United States and the individual members of the tribe.
The argument for the Government, however sound it might otherwise be, fails to recognize the impact of certain equitable considerations and the effect of the fiduciary duty of the Government to its Indian wards. The jurisdictional act, 43 Stat. 133, expressly confers jurisdiction on the Court of Claims to adjudicate “all legal and equitable claims,” arising under treaty or statute, which the Seminole Nation may have against the United. States, and the second amended petition avers:
“That since the passage of the Act of April 15, 1874, it was reported by the officers of the defendant [the United States] that the Seminole tribal officials were misappropriating the Seminole tribal funds entrusted to them, and robbing the members of the tribe of an equal share of the tribal income. That the reports of the Dawes Commission show conclusively that the governments of the Five Civilized Tribes were notoriously and incurably corrupt, that every branch of the service was infested with favoritism, graft and crookedness, and that by such methods the tribal officers acquired large fortunes, while the other members entitled to share in the tribal income received little benefit therefrom.”
It is a well established principle of equity that a third party who pays money to a fiduciary for the benefit of the beneficiary, with knowledge that the fiduciary intends to misappropriate the money or otherwise be false to his trust, is a participant in the breach of trust and liable therefor to the beneficiary. Cf. Duncan v. Jaudon, 15 Wall, 165; Manhattan Bank v. Walker, 130 U. S. 267. See Bogert, Trust and Trustees (1935), vol. 4, secs. 901, *569 955; Scott, Trusts (1939), yol. 3, sec. 321.1; American Law Institute, Restatement of the Law of Trusts (1935), sec. 321. The Seminole General Council, requesting the annuities originally intended for the benefit of the individual members of the tribe, stood in a fiduciary capacity to them. Consequently, the payments at the request of the Council did not discharge the treaty obligation if the Government, for this purpose the officials administering Indian affairs and disbursing Indian moneys, actually knew that the Council was defrauding the members of the Seminole Nation.
Furthermore, this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. E. g. The Cherokee Nation v. The State of Georgia, 5 Pet. 1; United States v. Kagama, 118 U. S. 375; Choctaw Nation v. United States, 119 U. S. 1; United States v. Pelican, 232 U. S. 442; United States v. Creek Nation, 295 U. S; 103; Tulee v. State of Washington, 315 U. S. 681, No. 318 this Term. In carrying out its treaty obligations with the Indian tribes the Government is something more than a. mere contracting party. Under a humane and self-imposed policy which has found expression in many acts of Congress[11] and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards. Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs and the disbursements of funds to satisfy treaty obligations, was composed of representatives faithless to their own people and without integrity would be a clear breach of the Government’s fiduciary obligation.[12] If those were the circum *570 stances, either historically notorious so as to be judicially noticed or otherwise open to proof, when the $66,422.64 was paid over at the request of the Seminole General Council during the period from 1870 to 1874, the Seminole Nation is entitled to recover that sum, minus such amounts as were actually expended for the benefit of the Nation by the Council.
Having formulated the proper rule of law, we must examine the facts of this case. Although the Court of Claims had jurisdiction of this issue, for such an action for breach of fiduciary duty growing out of treaty obligations is clearly an equitable claim within the meaning of the jurisdictional act, 43 Stat. 133, the court did not consider, and hence made no findings on this issue. We think the issue material. During the period in question, 1870-1874, the administration of Indian affairs and the disbursement of Indian moneys were lodged with the Department of the Interior. The Commissioner of Indian Affairs, under the general supervision of the Secretary of the Interior, actively supervised these matters.[13] There are ample indications in the record before us that the Seminole General Council was mulcting the Nation and that the proper Government officials may well have had knowledge thereof at the time some, at least, of the payments wei’e made. For about this time the Commissioner of Indian. Affairs received several warnings from his subordinates that “injustice to the majority” of the Seminóles existed,[14] that the chiefs were in the habit “of taking out what amount they *571 chose” from the annuities,[15] that the Seminóles were “in bad hands”,[16] and that the chiefs intended “to ‘gobble1 the next money for the purpose of keeping up their government”.[17] And the Acting Commissioner of Indian Affairs was evidently aware in 1872 of the possibility that the Council was faithless for he declined to change the method of payment at the request of the Seminole Chiefs “until the Department shall be fully satisfied that a proper disposition will be made of the funds if paid in the manner proposed by the Chiefs.”[18]
We do not say that all this establishes liability on the part of the Government for it is not our function, in reviewing judgments of the Court of Claims, to make basic findings ox fact. When the Court of Claims fails to make findings on a material issue, it is proper to remand the case for such findings. Cf. Universal Bat *572 tery Co. v. United States, 281 U. S. 580, 584-585. We do think, however, that the matter outlined above was sufficient to require the Court of Claims to make findings on this material issue, that is, findings as to whether the Seminole General Council, during the years 1870 to 1874, was corrupt, venal, and false to its trust; whether the appropriate Government officials charged with the duty of administering Indian affairs and disbursing funds to the Seminóles knew of that corruption, venality, and faithlessness, if such in fact existed, when any of the payments in question were made at the request of the Council; and, if so, whether the Nation received the benefit of any of those payments. Aecord-ingly, this phase of the case must be remanded so that the Court of Claims can consider such relevant evidence and other data as may be brought to its attention, make the necessary findings of fact, and thus determine whether this case fits into the i'ule which we have enunciated.

Item Five.

This is a claim for the moneys, $864,7'02.58 in all, paid to the Seminole tribal treasurer after the passage of the Curtis Act of June 28,1898, c. 517,30 Stat. 495,502, The payments were made during the fiscal years 1899 to 1907 and consisted of the following items: (a) $212,500 paid to discharge the per capita obligation under Article VIII of the Treaty of 1850 (see Item Two ante); (b) $29,750 paid to discharge the obligation of Article III of the Treaty of 1868 providing for the support of schools (see Item Three, ante) and for the support of the Seminole Government; (c) $622,156.87 paid pursuant to Section 12 of the Act of March 2,1889, c. 412, 25 Stat. 980,1004, providing for the payment of interest at five per centum per annum on $1,500,000 “to be paid semi-annually to the treasurer of said nation”; and, (d) $295.71, the “proceeds of labor.”
Section 19 of the Curtis Act, 30 Stat. 495,502, provides:
“That no payment of any moneys on any account whatever shall hereafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation.”
*573 Petitioner insists that this section prohibited the Government from making the payments in question to the Seminole treasurer, and that it is entitled to recover the sums illegally so paid. £
Assuming, without deciding, that Section 19 is applicable to the Seminole Nation and that an action could be brought by the Nation for payments made in violation thereof, there can be no recovery here because none of the payments contravened Section 19. The text of that section and its legislative history demonstrate that it prohibits only payments .to tribal officers which are “for disbursement” — i. e., payments to be distributed by them to members of the tribe. If the first clause of Section 19 is construed as prohibiting all payments to the tribe or its officers, then the later clauses, providing only for payments to members and per capita payments, are inadequate to dispose of the problems raised by the first clause. For then no provision is made for the expenses of maintaining and conducting the tribal government, despite the fact that the Seminole tribal government was not only to continue after the Curtis Act but was in fact relieved of the necessity of securing Presidential approval of its legislation[19] by an agreement ratified three days after the passage of that statute. See 30 Stat. 567, 569. Section 19, as originally introduced in the House, provided that payments of “all expenses incurred in transacting their business” were to be made under the direction of the Secretary of the Interior.[20] The deletion of this clause is persuasive that Congress intended that tribal officers should retain the right to disburse their funds for the expenses of their respective tribal governments. For these reasons we think Section 19 prohibits payment by the Government to the tribal treasurer only when such payments are to be distributed by him to members of the tribe. It has no application to money earmarked for educational or tribal purposes, and money intended for any purpose the tribe may designate.
*574 None of the payments in question were for disbursement to the individual members of the Seminole Nation. While the sum of $212,500 was paid pursuant to Article VIII of the Treaty of 1856, and while that obligation "'was originally an annuity payable per capita to the individual Seminóles, the character and purpose of this interest payment were by agreement changed into a payment for the benefit of the Seminole Nation itself, and this before the payment of the $212,500 from 1899 to 1907. The Act of April 15,1874, c. 97,18 Stat. 29, authorized the Commissioner of Indian Affairs, with the sanction of the Secretary of the Interior and the President, to pay this annuity into the treasury of the Seminole Nation, provided $5,000 was annually appropriated out of the annuity by the General Council for the school fund, and provided “that the consent of said tribe to such expenditures and payment shall be first obtained.” By act of the Seminole General Council on April 2, 1879, the Seminole Nation accepted the provisions of the Act of 1874, and consented that all annuities due or to become due under Article VIII of the Treaty of 1856 should be paid into the Seminole treasury, to be used as the tribal council should provide. This was a consensual conversion of the Government’s obligation from payments to individuals to payments to the tribe, and Section 19 of the Curtis Act is inapplicable to the $212,500 paid pursuant to this converted agreement.
While none of the payments were in violation of Section 19 of the Curtis Act and there can therefore be no recovery on that score, the Government is not necessarily relieved of all liability for this $864,702.58 claim. There remains for consideration the fiduciary duty of the Government, as discussed in Item Two, ante. During this period, 1899 to 1907, as from 1870 to 1874, the Secretary of the Interior and the Commissioner of Indian Affairs supervised Indian matters and the disbursement of Indian moneys. Apparently, it was the practice of the Department of the Interior to deposit the Seminole funds with the Assistant Treasurer of the United States at St. Louis to the credit of the tribal treasurer; the Indian agent for the Five Civilized Tribes did not disburse the Seminole payments although he did distribute moneys to the other tribes.[21] Shortly before the payments in question were made the Commission to the *575 Five Civilized Tribes [22] pointedly described in its annual reports to the Secretary of the Interior and Congress the-unbridled corruption of the various tribal governments, without singling out any particular government for unenviable distinction. Thus:
“Corruption of the grossest kind, openly and unblushingly practiced, has found its way into every branch of the service of the tribal governments. All branches of the governments are reeking with it, and so common has it become that no attempt at concealment is thought necessary. The governments have fallen into the hands of a few able and energetic Indian citizens, nearly all mixed blood and adopted whites, who have so administered their affairs and have enacted such laws that they are enabled to appropriate to their own exclusive use almost the entire property of the Territory of any kind that can be rendered profitable and available.”[23]
And again:
“The Commission is compelled by the evidence forced upon them during their examination into the administration of the so-called governments in this Territory to report that these governments in ail their branches are wholly corrupt, irresponsible, and unworthy to be longer trusted with the care and control of the money and otner property of Indian citizens, much less their lives, which they scarcely pretend to protect.”[24]
While these warnings were of a general nature, specific complaints of misgovernrnent, venality, and fraudulent conduct on the part of the Seminole leaders were brought to the attention of the Secretary of the Interior and the Commissioner of' Indian Affairs. By a letter to the Secretary of the Interior, dated January 2-1, 1898, certain Seminóles remonstrated against the ratification of the agreement concluded with the Seminole leaders on December 16, 1897. The remonstrance alleged misgovernment and the participation by these leaders in a land swindle at the expense of the tribe. The Secretary laid *576 this protest before Congress.[25] During much of the period in question, 1899-1907, and for some time prior thereto, two half-breed brothers were principal chief and treasurer, respectively, of the Seminole Nation. Together they ran a trading store in the Seminole country and extended credit by giving due bills, good only in trade at their store, to individual Seminóles in the amount of annuities or other payments owing those individuals. The activities of these brothers, and their system of credit in particular, were attacked on the floor of Congress in 1896 and 1897,[26] and severely criticized by an investigator for the Department of Justice in 1905, part of whose report was set forth in a letter from the Acting Commissioner of Indian Affairs to the Secretary of the Interior, dated November 11, 1908.[27]
*577 All this tends to show that the Seminole tribal officers might have' been faithless to their trust during the period in question, and that the Government officials administering Indian affairs and disbursing Seminole funds might have been aware of that faithlessness at the time payments were made to the Seminole treasurer. Here again the Court of Claims did not address itself to, and made no findings on, this material issue. As we said in the discussion of Item Two, ante, it is not our function to make basic findings of fact. Again we do not say that the showing with respect to this Item establishes breach of the Government’s fiduciary obligation, but we are of opinion that it is sufficient to justify remanding this branch of the case to the Court of Claims for further findings, in the light of such evidence as may be brought to its attention, as to whether the Seminole tribal officers were mulcting the Nation from 1899 to 1907; whether, if such were the case, the appropriate Government officials administering Indian affairs and disbursing moneys to the Semi-nóles had knowledge thereof at the time any of the payments to the tribal treasurer were made; and, if so, whether the Seminole Nation received the benefit of any sums expended by the tribal treasurer. On the basis of these findings the Court of Claims can then determine whether there was a breach of the Government’s fiduciary obligation, as defined in the discussion of Item Two, ante, and if there was a breach, the resultant liability.
Ill
Petitioner asserts that the Court of Claims committed numerous errors with respect to the items which it included in the list of gratuitous offsets, and the Government admits that the court erred in a few instances. However, since the case must be remanded to determine whether the Govermnent has any further obligation on *578 Items Two and Five, we deem it unnecessary to consider in detail the challenged offsets.
Petition for rehearing denied June 8, 1942.
One phase of this question does require attention. In Seminole Nation v. United States, No. 830 this Term, decided today, petitioner asserted that the Court of Claims gave the Government credit there for an offset which it had employed in the instant case, thus allowing a double credit. To avoid this confusion the Court of Claims should find and designate the precise gratuitous expenditures to be offset against the Government’s liability, instead of finding generally all the items which the Government may ever be entitled to use. Gratuity offsets resemble a fund in a bank, to be drawn upon by the Government in successive Indian claims cases until exhausted. Since they may be needed in future cases, it becomes important to know precisely what items have been employed to extinguish liability in a particular case, as the instant case and No. 830 demonstrate. The disadvantage of the alternative, to treat as binding in subsequent suits involving the same parties the findings of the Court of Claims that the Government has total offsets in a certain amount, is evident because it may require this Court to do a vain thing, that is, to examine offsets which might never be needed and which, even if disapproved, would not change the result reached by the Court of Claims.
The judgment below is reversed, with the exception of the disposition of Items One, Three and Four which is in all respects affirmed, and the entire cause is remanded to the Court of Claims with directions to make further findings with respect to Items Two and Five; to determine the additional liability of the Government, if any, thereon; and, to find and designate the particular gratuitous expenditures to be offset against the Government’s total liability.
Upon the remand the Court of Claims will be free to consider any legal or equitable defenses which the Government may interpose to the claims asserted there by petitioner.
So ordered.
Mr. Justice Reed took no part in the consideration or decision of this case.
Mr. Justice JacksoN dissents.

 82 C. Cls. 135.

 The Act of August 16, 1937, e. 651, 50 Stat. 650, conferred jurisdiction on the Court of Claims to reinstate and retry on the merits claims of the Five Civilized Tribes previously dismissed because set up by amended petition after the expiration of the time limit fixed in the respective jurisdictional acts.

 Seven items, amounting to $1,307,478.02, were considered by this Court in 299 U. S. 417. As to six of those items it was concluded that no jurisdiction existed in the Court of Claims, and no decision on the merits of those claims was expressed. The seventh item was examined on its merits and disallowed in large part. 299 U. S. 417, 431.

 The Act of August 12, 1935, c. 596, 49 Stat. 571, 596, 25 U. S. C., sec. 475a, provides in part:
“In all suits now pending in the Court of Claims by an Indian tribe or band which have not been tried or submitted, and in any suit hereafter filed in the Court of Claims by any such tribe or band, the Court of Claims is hereby directed to consider and to offset against any amount found due the said tribe or band all sums expended-gratuitously-by the united States for the benefit of 'the said tribe or band ; . . ,”

 93 C. Cls. 500.

 Petitioner does not question this finding of the Court of Claims. See Annual Reports of the Commissioner of Indian Affairs: 1876, pp. 212-213; 1877, pp. 690-691; 1878, pp. 286-287; 1879, pp. 341-342; 1881, pp. 280-281; 1883, pp. 90, 250-251; 1884, pp. 270-271; 1886, pp. 146, 154; 1887, pp. 98, 110 ; 1888. pp. 113, 122 ; 1890, pp. 89, 94 ; 1891, pp. 240, 250; 1892, pp. 247, 256; 1893, pp. 143, 147; 1894, p. 140; 1895, pp. 155, 161; 1896 pp. 151-158.

 “That all revenues of whatever character accruing to the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes, whether before or after dissolution of the tribal governments, shall, after the approval hereof, be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be prescribed by him; and he shall cause to be paid all lawful claims against said tribes which may have been contracted after July first, nineteen hundred and two, or for which warrants have been regularly issued, such payments to be made from any funds in the united States Treasury belonging to said tribes. . . .”

 Act of May 20, 1924, c. 162, 43 Stat. 133, as amended by 44 Stat. 568, 45 Stat. 1229, and 50 Stat. 650.

 Act of May 18,1872, c. 172,17 Stat. 122, 132.

 See Report of the Commissioner of Indian Affairs for 1873, pp. 211-212.

 There is no better example of this than the facts of the instant case. Despite the lapse of time and the bar of the statute of limitations, Congress authorized the Court of Claims to adjudicate all legal and equitable claims, arising under statute or treaty, which the Seminole Nation may have against the united States. And after an adverse decision by this Court on jurisdictional grounds, 299 U. S. 417, Congress again removed the bar. 50 Stat. 650.

 As was well said by Chief Judge (later Mr. Justice) Cardozo in Meinhard v. Salmon, 249 N. Y. 458, 464, 164. N. E. 545, 546:
“Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate, uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘disintegrating erosion’ of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.”

 See R. S. sees. 441, 444, 445, 463, 464, 2089. Cf. Act of April 15, 1874, c. 97, 18 Stat. 29.

 On December 6, 1869, the United States Indian Agent for the Seminóles wrote to the Commissioner of Indian Affairs as follows :
“I would state that they are in the habit of calling Councils, for any little thing that may arise, and spending from 2 to 15 days without effecting anything whatever, which would be of the least service to the nation [Seminole], except in expending the funds; which are taken out of those ordered paid per ‘capita’ to the nation.
“I find that it has been the custom heretofore for the Chiefs to order how the payment should be made, but at the same time making return to the department, upon rolls as if it had been paid per ‘capita.’
“I think that it is an injustice to the majority of the people, comprising this nation and the only way to avoid the unnecessary expenditure of money for Councils, etc., which are of but little benefit to the nation (for example the last council held cost the nation $700.00 for edibles alone and did no business) is for the department to give special orders in reference as to what amount shall be turned over to tho chiefs and the balance paid to heads of families in person.”

 In Ms annual report to tile Commissioner of Indian Affairs, dated September 1, 1870, the united States Indian Agent for the Seminóles said :
“Per capita payments are, in some instances, I think, a great evil; but as the system cannot be abolished, this nation [Seminole] having no constitutional government, and until such a form of government be adopted, I would recommend that the provisions of the treaty be rigidly enforced, and no moneys allowed to be paid except to the heads of families. Heretofore, as I have reported, the chiefs have been in the habit of taking out what amount they pilose, allowing the balance to be paid per capita. This is an injustice, as few receive the bulk of their annuities.” Report of the Secretary of the Interior, 41st Cong., 3d Sess. (1870-71), vol. 1, pp. 766-767.

 The report of John P. C. Shanks, Special Commissioner, to the Commissioner of Indian Affairs, dated August 9, 1875, states :
‘‘These claims are enormous in amount, and show too clearly that the Semi-nóles are in bad hands. These parties who had these claims (except Harjo, who is an assignee) are or have been officials in the Nation. Robert Johnson is a Negro, and is interpreter to the Chief; Chupco is present chief; John Jumper was former chief; James Factor, a half breed, is treasurer; E. J. Brown is a white man, formerly U. S. Indian Agent of the Seminole Nation, since has had the address to procure his admission as a member of the tribe.
“These men have evidently stood together in the wrong, of procuring such allowances, and did stand together in refusing to relinquish the claims, or a part of them, except a deduction for present payment upon claims which did not bear interest.”

 On November 20, 1878, special agent Meacham wrote the Commissioner of Indian Affairs that “Some of the Band Chiefs are tyrants and despots, holding their people under abject fear and in some instances of actual servitude.” The letter also referred to the intention of the Chiefs “to ‘gobble’ the next money for the purpose of keeping up their government.”

 On January 5, 1872, the Acting Commissioner of Indian Affairs wrote the United States Indian Agent for the Seminóles :
“In reply to your letter of the 20 Dee. last, and to the request of the Seminole Chiefs that their National funds be hereafter paid to the Treasurer of the Nation instead of per capita, I have to say that it is not deemed advisable to change the manner in which payment of annuities to these Indians has heretofore been made until the Department shall be fully satisfied that a proper disposition will be made of the funds if paid in the manner proposed by the Chiefs.”

 Act of Tone 7,1807, c. 3, 30 Stat. 62, 84.

 Section 19, as originally introduced, was as follows :
“. . . that no payments of any moneys, on any account whatever, be made to any of the tribal governments or to any officer thereof for disbursement, but payments of all expenses incurred in transacting tlieir business and of all sums to members of said tribes shall be made under the direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the united States, and the same shall not be liable to the payment of any previously contracted obligation.” [Italics supplied.] H. R. 8581, 55th Cong., 31 Cong. Sec. 3869.

 Letter of Assistant Attorney General Van Devanter to the Secretary of the Interior, dated July 12, 1898 ; H. Doc. yol. 23, 57th Cong., 1st Sess. (1901-1902), p. 231.

 Commonly known as the Dawes Commission. It was created by the Act of March 3, 1893, e. 209, 27 Stat. 612, 645, to negotiate with the Creeks, Cherokees, Choctaws, Chickasaws, and Seminóles for the extinguishment of tribal titles to lands, the allotment of their lands in severalty, and the division of their funds equally among the members of those tribes.

 Report dated November 20, 1894, Appendix B, H. Ex. Doc., vol. 14, 53d Cong., 3d Sess. (1894-95), p. LXVIII. See also pp. LXIX-LXX.

 Report dated November 18, 1895, Exhibit A. H. Doc., vol. 14, 54th Cong., 1st Sess. (1895-96), p. XCV. See also pp. LXXXVII, XCIII-XCIV.
And see report dated October 11, 1897, Exhibit B, H. Doc., vol. 12, 55th-Cong., 2d Sess. (1897-98), pp. CXIX, CXXI.

 See S. Doc. 105, 55th Cong., 2d Sess. (1898), pp. 2-4. This remonstrance stated in part:
“There was the sum of $191,294.20 which never entered the treasuries of the united States or the Seminóles. The reply given us about the disposition of this money by our authorities was that during the transfer of these lands to the united States there was a lawyer who negotiated the agreement and tools that amount for his pay. The name of the lawyer was never mentioned and no receipt of the alleged deal was ever shown. We call your attention to this. We ask that you take note of the town-site laws of Wewoka and see to whom only these laws are beneficial and whom they oppress. . . .
“We beg leave to state further that we have no law regulating the bond of our treasurer or chief, and according to the Seminole law no action or bill can be placed before the council without the consent of the chief. Our laws do not admit of an auditor, and our people are entirely ignorant of the condition of our finances. . . . We ask that any disposition of moneys belonging to the Seminóles and the management of their schools be made with the approval of the Secretary of the Interior. . . .”

 See 28 Cong. Rec. 2070 ; 29 Cong. Rec. 1261.

 This report stated in part:
“It is not too much to say that, in view of the ignorance of these Indians, this system of credit is dishonest. It should be condemned because it keeps these Indians in a constant state of poverity. They do not realize that these due bills are in fact money, and the result is that they are squandered without care. I am not informed as to whether the Department of the Interior has knowledge of this state of affairs. v It should be brought to its attention, so that, if possible, it may take steps looking to the breaking up of the system, which can be done by having the appropriations distributed in some other manner.”
Wm. L. Bowie, Special Investigator for the Interior Department, reported to the Superintendent for the Five Civilized Tribes in 1916 that:
“Governor Brown and his brother have been in the mercantile business in the Seminole Nation for many years. It is a fact much commented upon by those acquainted with Seminole tribal affairs, that for a number of years Governor Brown held the dual relationship to the members of the Seminole tribe of governor and paymaster on the one hand, and Indian trader on the other hand.”
“. . . In my opinion Governor Brown has shown in his transactions with John Smith and Lizzie Yahola, that he has little regard for the welfare and *577 protection of Indians in general, and it is unfortunate that he occupies a position -which enables him by reason of the confidence placed in him as such official to impose upon them.”
On the basis of reports from subordinates Assistant Commissioner of Indian Affairs Merrit recommended to the Commissioner of Indian Affairs, by a letter dated July 20, 1916, that the Seminole tribal government be abolished as “the only way to prevent Brown and Crain from continuing to use their official positions to advance their personal interests at the expense of the Indians under their authority.”