Justice Himonas, concurring:
*428 ¶82 I concur in Justice Durham's opinion without reservation. I write separately to more fully explain why, in my view, the tribe is not a necessary party under rule 19(a) of the Utah Rules of Civil Procedure and to offer some practical guidance to the district courts on how to manage a dual-capacity suit like this one. I also write separately to lay out why I believe the tribal exhaustion doctrine applies to state courts and why it is a rule of exhaustion and not abstention. Last, I write separately to identify a jurisdictional issue the district court and the parties should take up on remand.
I. RULE 19 IN THE CONTEXT OF DUAL CAPACITY SUITS
¶83 The plaintiffs have sued certain tribal officials-Dino Cesspooch, Jacki LaRose, and Sheila Wopsock-in their individual and official capacities. The individual-capacity claims seek money damages and the official-capacity claims seek prospective injunctive relief requiring these tribal officials, acting in their official capacity, to forebear from interfering in certain respects with the plaintiffs' business activities.
¶84 I agree with the majority that, to the extent the plaintiffs' official-capacity suit seeks a prospective injunction enjoining the tribal officials from violating federal (as opposed to tribal) law, the plaintiffs have stated a valid claim under Ex parte Young , 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that is not barred by sovereign immunity. I also agree with the majority that the Ute Tribe's absence from this suit will not "impair or impede [its] ability to protect [its] interest" because the tribal officials, acting in their official capacity, may be presumed to adequately represent the interests of the tribe. Supra ¶¶ 34-36. And the majority is correct that "[t]here is no argument that the tribal officials [acting in their official capacities] will do anything antithetical to the interests of the tribe or that they will fail to make any 'reasonable argument that the tribe would make if it were a party.' " Supra ¶ 38 (quoting Salt River Project Agric. Improvement & Power Dist. v. Lee , 672 F.3d 1176, 1180 (9th Cir. 2012) ). Consequently, the tribe need not be joined under rule 19(a)(2)(i) of the Utah Rules of Civil Procedure. While the tribe surely has "an interest related to the subject of the action"-an interest in ensuring that it may regulate business activities on the reservation to the fullest extent allowed by federal law-it is not "so situated that the disposition of the action in [its] absence ... may as a practical matter impair or impede [its] ability to protect that interest" because the tribal officials will fully represent its interests. UTAH R. CIV. P. 19(a)(2)(i).[1]
¶85 I write separately to more fully show our math under rule 19(a)(2)(i). While foundational principles establish that sovereigns are not necessary parties to officer suits under Ex parte Young , neither the majority opinion nor the authority it cites fully explains why we can state, with absolute confidence, that the tribal officials will fully represent the interests of the tribe. It is certainly not because the tribal officials will necessarily have the tribe's best interests at heart in the individual-capacity damages suits against them. To the contrary, "a person sued in his official capacity has no stake, as an individual, in the outcome of the [official-capacity] litigation," and therefore does not necessarily have an incentive to vigorously defend in that litigation. Johnson v. Bd. of Cty. Comm'rs of Fremont , 85 F.3d 489, 493 (10th Cir. 1996) (citation omitted). In addition, "[t]he distinctions between suits against an official in his individual and official capacities [can] give rise to differing and potentially conflicting defenses." Id.
¶86 The reason we are right to be confident that the tribal officials will fully represent the interests of the tribe is that an Ex -parte -Young -style suit for prospective injunctive relief against tribal officials is not really *429 a suit against the tribal officials at all. As the majority explains, in official-capacity suits "the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." Lewis v. Clarke , --- U.S. ----, 137 S.Ct. 1285, 1291, 197 L.Ed.2d 631 (2017) (citation omitted). Indeed, "official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " Hafer v. Melo , 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citation omitted). They "rest[ ] on the 'obvious fiction' that [a suit for prospective injunctive relief against sovereign officials] is not really against the [sovereign], but rather against an individual who has been 'stripped of his official or representative character' because of his unlawful conduct." Va. Office for Prot. & Advocacy v. Stewart , 563 U.S. 247, 267, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011) (citations omitted). But because it is a "fiction" that Ex -Parte -Young -style suits run against the government official, as opposed to the government entity itself, they should in reality "be treated as suits against the [government entity]." Hafer , 502 U.S. at 25, 112 S.Ct. 358 (citation omitted).
¶87 Here, this means that the tribal officials, as individuals, should have no personal control over the course of the official-capacity litigation. Instead, even though the tribal officials are the nominal defendants in the official-capacity suit, "the government entity [must] receive[ ] notice and an opportunity to respond." Kentucky v. Graham , 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (emphasis added) (citation omitted). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [government] entity," not the individual tribal official. Id. (citation omitted) Thus, except where the government entity that is the real party in interest might, itself, take a position "antithetical to the interests of the tribe," the obvious potential conflict between the officials in the individual-capacity suit and the government entity those same officials represent in their official capacity should not pose a problem. See Salt River , 672 F.3d at 1181. And, of course, if the tribal officials leave office during the pendency of this action, the plaintiffs' Ex -parte -Young -style suit "may be continued and maintained ... against [their] successor[s], if within 6 months after the successor takes office, it is satisfactorily shown to the court that there is a substantial need for so continuing and maintaining it." UTAH R. CIV. P. 25(d).
¶88 This explanation for why the tribe need not be joined under rule 19(a)(2)(i) has implications for how this lawsuit should proceed in the event that it remains or returns, in whole or in part, to the district court. First, even though all of the claims against the tribe itself have been dismissed because of the tribe's sovereign immunity, the underlying tribal entity against which the plaintiffs are seeking their injunction-be that the tribe itself or the Ute Tribal Employment Rights Office-must continue to receive notice and an opportunity to be heard. Graham , 473 U.S. at 166, 105 S.Ct. 3099.
¶89 Second, in the event that the tribal officials end up represented by the same counsel in both their official and individual capacities, the district court and all counsel should be on the lookout for potential conflicts of interest in this dual representation. See Johnson , 85 F.3d at 493 ("Given the potential conflict between the defenses available to a government official sued in his individual and official capacities, we have admonished that separate representation for the official in his two capacities is a 'wise precaution.' " (citation omitted)); see also Galvin v. Lloyd , 663 F.Supp. 1572, 1581 (D. Conn. 1987) ("[J]oint representation in [dual-capacity] suits sometimes creates a potential conflict of interest because different theories of liability and defenses may be applicable under each capacity.").
¶90 In this regard, I note with approval that, at least for a time, the tribal officials were represented by the tribe's counsel in the official-capacity suit and by personal counsel in the individual-capacity suit. This is a good practice that is too often neglected in dual capacity suits such as the one before us. Cf. Dina Mishra, Note, When the Interests of Municipalities and Their Officials Diverge: Municipal Dual Representation and Conflicts of Interest in § 1983 Litigation , 119 YALE L.J. 86, 90 (2009) ("[D]espite their importance, *430 conflicts of interest in ... dual representation [lawsuits] are 'frequently overlooked by litigants' ... and the issue 'has received scant attention in appellate opinions.' " (citation omitted)).
II. THE MAJORITY'S EXHAUSTION ANALYSIS
¶91 I now turn to the majority's articulation and application of the tribal exhaustion rule. I agree with the majority that our court must abstain from hearing this case until the plaintiffs have exhausted available tribal remedies. In my view, the tribal exhaustion rule applies whenever a tribal court has a colorable claim of jurisdiction. See, e.g. , Stock W. Corp. v. Taylor , 964 F.2d 912, 919 (9th Cir. 1992) (en banc) (tribal exhaustion rule requires court to stay hand whenever "the record presents a colorable question" whether tribal court has jurisdiction); Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation , 862 F.3d 1236, 1243 (10th Cir. 2017) (tribal exhaustion rule applies "so long as tribal courts can 'make a colorable claim that they have jurisdiction' " (citation omitted)). Whether a tribal court has a colorable claim of jurisdiction over a nonmember's civil action turns on whether there is a colorable argument that the tribe could exercise regulatory authority over the subject matter of the dispute. Strate v. A-1 Contractors , 520 U.S. 438, 447, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). And whether a tribe could exercise regulatory authority over the subject matter of the dispute turns on application of the Montana v. United States exceptions to the general rule that "Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation." Id. at 446, 117 S.Ct. 1404. Those exceptions are: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," Montana v. United States , 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (citations omitted), and (2) "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," id. at 566, 101 S.Ct. 1245 (citations omitted). In my view, the majority is correct that, at bottom, the plaintiffs' lawsuit centrally involves the exercise of the tribe's regulatory authority over the activities of nonmembers who engage in consensual commercial relationships with the tribe or its members-and it therefore falls within the first Montana exception to the general rule that tribes lack regulatory or adjudicatory jurisdiction over nonmembers in connection with their off-reservation conduct. See supra ¶¶ 42-52 & n.11.
¶92 I write separately to (1) explain why I believe the tribal exhaustion doctrine applies in state court, (2) explain why I believe the tribal exhaustion doctrine is an exhaustion doctrine, not an abstention doctrine, and (3) flag an additional jurisdictional issue that the district court should explore on remand.
A. The Tribal Exhaustion Doctrine Applies in State Courts
¶93 I agree with the majority that the tribal exhaustion rule applies in state court as well as federal court. The United States Supreme Court has explained that the tribal exhaustion rule applies to "any nontribal court." Iowa Mut. Ins. Co. v. LaPlante , 480 U.S. 9, 16, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (emphasis added); see also Nevada v. Hicks , 533 U.S. 353, 398, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (O'Connor, J., concurring) (tribal exhaustion rule determines "the relationship between tribal courts and state and federal courts." (emphasis added)). This is because the tribal exhaustion rule is an "interstitial and court-created ... component of the law embodying the federal policy supporting tribal self-government and self-determination" that is therefore binding on the states under the Supremacy Clause. Drumm v. Brown , 245 Conn. 657, 716 A.2d 50, 62-63 (1998).
¶94 I recognize that some courts have concluded that the tribal exhaustion rule is not binding on the states. In Astorga v. Wing , for example, the Arizona Court of Appeals reasoned that the tribal exhaustion rule might *431 not apply to state courts because "[u]nlike ... state courts, federal courts retain the power to review an Indian court's exercise of jurisdiction over non-members." 211 Ariz. 139, 118 P.3d 1103, 1106 (Ariz. Ct. App. 2005) (citation omitted). Because imposing the tribal exhaustion rule on state courts would oust them from any opportunity to ensure that tribal courts properly apply state law, Astorga reasoned, this result cannot be what Congress intended. Id. at 1107-09.
¶95 In my view, these courts' analysis cannot be squared with the express language in LaPlante . Supra ¶ 93. It is also inconsistent with fundamental principles of Indian law as well as the policy that, according to the United States Supreme Court, undergirds the tribal exhaustion doctrine.
¶96 First, the notion that the tribal exhaustion rule does not apply to state courts is inconsistent with fundamental principles of Indian law. "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." Rice v. Olson , 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945) (citing Worcester v. Georgia , 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832), abrogation recognized by Nevada v. Hicks , 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) ). Congress has expressed its preference for limiting state control over Indian affairs in statutes including the Indian Child Welfare Act (which imposes a variety of limits on and federal oversight of state exercises of jurisdiction over Indian children in adoption proceedings), 25 U.S.C. §§ 1901 through 1963, and the Major Crimes Act (which gives exclusive jurisdiction to federal courts to adjudicate major crimes perpetrated in Indian country by one Indian against another), 18 U.S.C. § 1153.
¶97 In light of these background principles, it would be anomalous to conclude that the tribal exhaustion rule only applies in federal court. The effect of this ruling would be to place state courts in a superior position to federal courts in hearing cases that implicate tribal jurisdiction. Conceivably, given the general rule that state and federal courts have concurrent subject matter jurisdiction, Robb v. Connolly , 111 U.S. 624, 636, 4 S.Ct. 544, 28 L.Ed. 542 (1884), this might give rise to a scheme where plaintiffs overwhelmingly chose to litigate in state court instead of tribal court-a state of affairs that would wholly subvert the federal policy of encouraging the development of tribal court systems, see El Paso Nat. Gas Co. v. Neztsosie , 526 U.S. 473, 484, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (rooting the tribal exhaustion doctrine in Congress's "policy of supporting tribal self-government" (citation omitted)); see also LaPlante , 480 U.S. at 15, 107 S.Ct. 971 (exhaustion rule is rooted in the federal policy of "[p]romot[ing] ... tribal self-government and self-determination").[2]
¶98 This brings me to my second point, which is that the policy underlying the tribal exhaustion rule supports the proposition that it applies in state court. As I have just explained, the purpose of the tribal exhaustion rule is to advance a policy of supporting "tribal self-government and self-determination." LaPlante , 480 U.S. at 15, 107 S.Ct. 971. The United States Supreme Court has clarified that the predominant, if not sole, policy underlying the tribal exhaustion requirement is the proposition that "[e]xhaustion [is] appropriate ... because 'Congress is committed to a policy of supporting tribal self-government.' " Neztsosie , 526 U.S. at 484, 119 S.Ct. 1430 (citation omitted). When a state court assumes control over litigation that could also proceed in tribal court it has the *432 exact same effect on tribal self-determination as when a federal court assumes such control-in both instances, the federal policy of "encourag[ing] the[ ] development. ... [of] [t]ribal courts" is subverted. LaPlante , 480 U.S. at 14-15, 107 S.Ct. 971. Because the policy underlying the tribal exhaustion rule admits of no distinction between federal and state courts, I conclude that the tribal exhaustion doctrine applies to state courts to the same extent it applies to federal courts.
¶99 The dissent dismisses these policies as "generalities" that should not ultimately inform our analysis of the tribal exhaustion doctrine. The dissent thinks that because the Supreme Court has not directly spoken to whether the tribal exhaustion doctrine applies to state courts, it is up to us to enact our own preferences about "how to balance the needed deference to sovereignty and the jurisdiction of the tribal courts." Infra ¶ 128.
¶100 The dissent then draws on other generalities, such as the generality that "[e]xhaustion ... is a principle that regulates the timing of proceedings in tribunals that operate in a hierarchical relationship," to analogize the tribal exhaustion doctrine to, for example, the requirement to exhaust administrative remedies. Infra ¶ 121. It then urges that we independently balance jurisdictional and sovereignty considerations to arrive at our own approach to the state-tribal relationship. Infra ¶¶ 128-29.
¶101 The dissent's analysis misunderstands our role vis-à-vis the United States Supreme Court. When we interpret federal law, we should not look to whether there is any "controlling statute or binding precedent" that stands in the way and then, if there is not, proceed to balance the interests involved in the case as we think best. Cf. Adam Liptak, An Exit Interview With a Judicial Firebrand , N.Y. TIMES , Sept. 12, 2017, at A18 (noting former Judge Richard Posner's view that the role of a court is to decide for itself what the sensible resolution of a dispute is and then reach that resolution unless "a recent Supreme Court precedent or some other legal obstacle [stands] in the way of ruling in favor of that sensible resolution"). Instead, we should strive to resolve the federal question before us in a way that is faithful to, and coheres with, operative federal principles, policies, and pronouncements. Cf. Willis v. Aiken , 8 F.3d 556, 565 (7th Cir. 1993) (lower courts interpreting federal law are "bound not only by the letter but by the spirit of the doctrines of stare decisis and precedent"); Application of Johnston , 502 F.2d 765, 774 (C.C.P.A. 1974) (Rich, C. J., dissenting) ("Under our judicial system, it is the duty of a judge of a lower court to try to follow in spirit decisions of the Supreme Court-that is to say, their 'thrust'."), judgment reversed by Dann v. Johnston , 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976).
¶102 Thus, there is no cause to dismiss as "generalities" the policies on which I draw. Nor should we ignore the Supreme Court's pronouncement-dicta though it may be-that the tribal exhaustion rule applies to "any nontribal court." LaPlante , 480 U.S. at 16, 107 S.Ct. 971. Instead, drawing on these policies and pronouncements, we should think critically and sympathetically about what result they support in this case. In my view, the federal policies on which I draw-which explicitly and implicitly aim at encouraging tribal self-government and self-determination and protecting tribal sovereignty-support extension of the tribal exhaustion rule to state courts.
¶103 I also disagree with the dissent's observation that because "exhaustion" (at least considered at a high level of generality) implies a "hierarchical relationship," the tribal exhaustion rule cannot be understood to apply in state courts. Respectfully, this analysis is insensitive to the Indian tribes' unique status and history-a status and history that should inform how we construe legal terms imported from other areas of law into the Indian law context.
¶104 Unlike administrative agencies, or even states, tribes are not subordinates in our constitutional hierarchy. They are "domestic dependent nations." Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla. , 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (citation omitted). This means that, while they are subject to Congress's plenary control, "they remain 'separate sovereigns pre-existing the Constitution.' "
*433 Michigan v. Bay Mills Indian Cmty. , --- U.S. ----, 134 S.Ct. 2024, 2030, 188 L.Ed.2d 1071 (2014) (citation omitted). And while Congress's powers over Indian affairs are plenary, it is well-established that "[u]nder a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of [The U.S. Supreme] Court, [Congress] has charged itself with moral obligations of the highest responsibility and trust" toward these sovereigns. Seminole Nation v. United States , 316 U.S. 286, 296-97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942) (footnote omitted).
¶105 Thus, just as we are, in a sense, fiduciaries of Congress and the United States Supreme Court when interpreting federal law, supra ¶ 101, so does well-established federal law make us, in a sense, fiduciaries of the tribes. Federal policy is to respect and protect the tribes' pre-constitutional sovereignty. And this understanding of tribal sovereignty-and Congress's relationship to the tribes-informs my understanding of the tribal exhaustion doctrine. In light of the tribes' inherent sovereignty, I resist any construction of the tribal exhaustion doctrine on which it implies that tribes, like administrative agencies, occupy a subordinate role in a hierarchy. Instead, I believe it is proper to emphasize the other-dominant-theme in the Supreme Court's exhaustion jurisprudence: the policy of encouraging the development of tribal judicial institutions, the better to facilitate the discharge of the Federal Government's "humane and self imposed policy" in favor of facilitating tribal self-government and self-determination. Seminole Nation , 316 U.S. at 296, 62 S.Ct. 1049.
B. The Tribal Exhaustion Rule Is a Rule of Exhaustion, Not Abstention
¶106 For many of the reasons I think the tribal exhaustion rule applies in state court, I also agree with the majority that the rule is a rule of exhaustion , not abstention. The practical difference between a tribal exhaustion rule and a tribal abstention rule is that, if the rule were one of abstention, courts would likely be called upon to balance multiple factors, including judicial economy concerns and the avoidance of piecemeal litigation. See, e.g. , Colo. River Water Conservation Dist. v. United States , 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) [hereafter Colorado River ] ("In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction [by a state court], a federal court may ... consider such factors as the inconvenience of the federal forum, ... the desirability of avoiding piecemeal litigation, ... and the order in which jurisdiction was obtained by the concurrent forums." (citations omitted)). If, on the other hand, the rule requires exhaustion, then state courts need not take broad concerns of judicial economy into account in deciding whether to stay their hand.
¶107 I think the tribal exhaustion rule does, indeed, require exhaustion. The Supreme Court has consistently described the doctrine as a rule of exhaustion, not abstention, and it has never indicated that courts should apply a multifactorial, abstention-style balancing test to determine when exhaustion is appropriate. See Neztsosie , 526 U.S. at 483, 119 S.Ct. 1430 (describing "doctrine of tribal-court exhaustion"); Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians , 471 U.S. 845, 856-57, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) ("[e]xhaustion of tribal court remedies" is rooted in the "policy of supporting tribal self-government and self-determination"); see also LaPlante , 480 U.S. at 16, 107 S.Ct. 971 (discussing "the exhaustion rule announced in National Farmers Union "). Moreover, it has stated the rule in categorical terms; "comity requires that tribal remedies be exhausted before district court considers issue of tribal court jurisdiction." Granberry v. Greer , 481 U.S. 129, 131 n.4, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (emphasis added) (citing Nat'l Farmers Union , 471 U.S. 845, 105 S.Ct. 2447 ).
¶108 Additionally, as I have already explained, the exhaustion requirement is rooted in the congressional policy in favor of promoting the development of tribal courts and tribal self-government and self-determination. Supra ¶¶ 96-101.[3] It is therefore unlike *434 the Colorado River abstention doctrine that otherwise applies when federal courts are considering whether to stay their hand in a matter over which different United States court systems have concurrent jurisdiction.
The tribal exhaustion doctrine is in no way based on Colorado River .... [T]he Colorado River doctrine "proceeds from the premise that 'the federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given to them" ' " and ... therefore, the pendency of litigation in state court is not a bar to proceedings in federal court involving the same subject matter in the absence of "exceptional circumstances." The policy which animates the tribal exhaustion doctrine, however, "subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government." Colorado River abstention is thus the exception to the rule, whereas tribal exhaustion is the rule rather than the exception.
Bank One, N.A. v. Shumake , 281 F.3d 507, 514-15 (5th Cir. 2002) (third alteration in original) (citation omitted). Because the Supreme Court calls the tribal exhaustion rule an "exhaustion rule," and because the Court has not incorporated the Colorado River factors into that rule, I conclude that it is, indeed, a rule of exhaustion that requires state and federal courts to give tribal courts the first crack at cases colorably falling within their jurisdiction.
C. Ute Tribal Law and the Jurisdiction of Courts of the Ute Indian Tribe
¶109 Finally, I flag an issue for the district court to explore on remand. The majority is correct to remand this case to the district court. Supra ¶ 81. And the majority is also correct that the district court, on remand, has discretion to either stay the action before it or dismiss the plaintiffs' complaint without prejudice, to give the plaintiffs an opportunity to first file their suit in tribal court. Supra ¶ 81.
¶110 In the course of deciding whether a stay or dismissal is more appropriate, the district court may wish to explore whether the plaintiffs have any nonfrivolous basis for filing a subset of their claims-their official-capacity claims-in tribal court. At first blush (and perhaps even in the final analysis), the Ute Law and Order Code appears to bar the tribe's courts from exercising jurisdiction over "claims against ... any Tribal officers or employees in their official capacities" in circumstances such as the ones at issue in this lawsuit. UTE LAW & ORDER CODE § 1-2-3(5).[4] While there may be an argument that this provision-which falls under the "personal jurisdiction" section of the Law and Order Code-does not apply as its plain language suggests, its plain language raises the possibility that no reasonable plaintiff could in good faith file such a claim in Ute Tribal Court.
¶111 To be sure, complaints must first be filed in tribal court whenever there is a colorable argument that the tribal court *435 may have jurisdiction. Norton , 862 F.3d at 1243 (tribal exhaustion rule applies "so long as tribal courts can 'make a colorable claim that they have jurisdiction.' " (citation omitted)). And our courts should be particularly hesitant to find no colorable claim of tribal jurisdiction based on an interpretation of a tribal code (as opposed to federal jurisdictional law). See Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe , 117 F.3d 61, 66 (2d Cir. 1997) (declining "to hold that the St. Regis Mohawk Tribal Court is a nullity under the tribal constitution" because "courts, as a general matter, lack competence to decide matters of tribal law and for us to do so offends notions of comity underscored in National Farmers "). But nor should anything in our opinion today be taken to require a plaintiff to file a frivolous complaint. Cf. UTAH R. PROF'L CONDUCT 3.1 (lawyers have an ethical obligation not to bring frivolous claims); see also Nat'l Farmers Union , 471 U.S. at 856 n.21, 105 S.Ct. 2447 (exhaustion not required if assertion of tribal jurisdiction is in bad faith or "patently violative of express jurisdictional prohibitions").
¶112 I acknowledge that some courts have held that under National Farmers Union 's"patently violative of express jurisdictional prohibitions" exception, "the only relevant 'jurisdictional prohibitions' ... are those arising under federal law" on the basis "that construction of tribal law is 'solely a matter within the jurisdiction of the tribal courts.' " Basil Cook Enters. , 117 F.3d at 67 (quoting Talton v. Mayes , 163 U.S. 376, 385, 16 S.Ct. 986, 41 L.Ed. 196 (1896) ). Equally, I recognize that courts have held that "a federal court must look to the conduct of the [tribal] court itself, rather than the parties, in assessing bad faith" under National Farmers '"bad faith" exception to the tribal exhaustion rule. Acres v. Blue Lake Rancheria , No. 16-cv-05391, 2017 WL 733114, at *2 (N.D. Cal. Feb. 24, 2017) (citing Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc. , 715 F.3d 1196, 1201 (9th Cir. 2013) ). These opinions underscore my view that the district court must take great pains to ensure that there is no nonfrivolous basis for asserting a particular claim in tribal court before it may retain control of that claim. But I remain convinced that the tribal exhaustion doctrine cannot require a plaintiff to file a truly frivolous claim in tribal court-including a claim that the tribe's own law expressly and unambiguously precludes.
¶113 On remand, therefore, I believe it would be prudent for the district court to request briefing from the parties-including the tribal officials-on whether there is any reason to think that the tribe's courts could assert jurisdiction over the plaintiffs' official-capacity claims. If a nonfrivolous argument could be made that the tribe's courts have jurisdiction over official-capacity claims, then those claims must first be brought in tribal court. See Stock W. Corp. , 964 F.2d at 920 (holding that whether a provision of the Colville Law and Order Code applies to bar a particular claim "is a matter that requires an interpretation of legislative intent that should be conducted in the first instance by the Colville tribal courts"). If not, then the district court should consider retaining jurisdiction over the official-capacity claims, and perhaps stay them pending resolution of those portions of the plaintiffs' lawsuit that can proceed in tribal court.

Other appellees are Dino Cesspooch (in his individual and official capacities), Jackie LaRose (in his individual and official capacities), Sheila Wopsock (in her individual and official capacities), Newfield Production Company, Newfield Rocky Mountains, Inc., Newfield RMI, LLC, Newfield Drilling Services, Inc., L.C. Welding & Construction, Inc., Scamp Excavation, Inc., Huffman Enterprises, Inc., LaRose Construction Company, Inc., and D. Ray C. Enterprises, LLC.

See Piper Aircraft Co. , 454 U.S. at 255, 102 S.Ct. 252 (agreeing "that a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum") (citing Koster v. (Am.) Lumbermens Mut. Cas. Co. , 330 U.S. 518, 831-32, 67 S.Ct. 828, 91 L.Ed. 1067 (1947) ).

My difference with my colleagues has nothing to do with one or the other of us "misunderstand[ing]" our relationship with the United States Supreme Court. See supra ¶ 101. I think we all understand this relationship quite well. We just read the relevant precedent differently.
Like my colleagues, I embrace the duty to be "faithful" to the "operative federal principles" set forth in governing Supreme Court precedent. See supra ¶ 101. Yet I do not think the principle of exhaustion set forth in LaPlante and National Farmers Union applies with equal force in a case involving the interplay between tribal courts and state courts. And because I find the comity considerations implicated in a case like this one to be quite distinct from those addressed by the court in these cases, I think it falls to us to decide the question presented.

Drumm v. Brown , 245 Conn. 657, 716 A.2d 50, 62-63 (1998) (suggesting that the exhaustion doctrine, inseparable from the policy of deference to tribal courts, is an interstitial rule of federal common law, which is binding upon state courts under the Supremacy Clause; concluding that the exhaustion doctrine is binding on state courts because states are equally likely to disrupt the "federal policy supporting tribal self-government"); contra Meyer & Assocs. v. Coushatta Tribe of La. , 992 So.2d 446, 450 (La. 2008) (refusing to apply the doctrine of exhaustion in the context of a state court proceeding); Astorga v. Wing , 211 Ariz. 139, 118 P.3d 1103, 1106 (Ariz. Ct. App. 2005) (finding that the exhaustion rule did not apply to state courts because federal courts have the ability to review these determinations, whereas state courts do not).