**UNITED STATES of America**

v.

**Harvey DURO, Sr. and Desert Mobilehome Park, Inc., a California corporation.**

**Case No. EDCV 07–01309–SGL (JCRx).**

United States District Court, C.D. California.

April 30, 2009.

Jonathan B. Klinck, Monica L. Miller, AUSA—Office of US Attorney, Los Angeles, CA, for United States of America.

J. Scott Zundel, J. Scott Zundel Law Offices, Palm Desert, CA, for Harvey Duro, Sr. and Desert Mobilehome Park, Inc., a California corporation.

## PROCEEDINGS: FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEPHEN G. LARSON, District Judge.

### ORDER RE REMEDIES AFTER BENCH TRIAL

After deciding in favor of the United States of America (the "government") in part in its summary judgment Order, the Court received evidence during an eight-day bench trial, and heard closing arguments on this day. Based on the record before it, the Court makes the following findings of fact and conclusions of law, and makes the following order regarding an appropriate remedy.

## I. FINDINGS AND CONCLUSIONS AS TO LIABILITY

■ On October 7, 2007, the government filed a complaint against Harvey Duro, Sr., and Desert Mobilehome Park, Inc. ("the Park"), seeking injunctive relief, money damages, and "such other and further relief as the Court deems appropriate." The complaint alleged a violation of the Court-approved Stipulation that settled the parties' prior case (*United States v. Harvey Duro. Sr.*, ED CV 03–0754 RT (SGLx) ("*Duro I*")): failure to obtain a lease in violation of 25 U.S.C. § 415; public nuisance; and private nuisance.

On April 1, 2009, the Court found in favor of government with respect to the claim for breach of the Stipulation (based largely on Mr. Duro's failure "to bring the park in to compliance with all applicable governmental codes, standards, and regulations") and the claim for operating a residential and business operation on allotted Indian land without a government-approved lease in violation of 25 U.S.C. § 415. In that same Order, the Court dismissed the claims for alleged violations of California's private and public nuisance law, finding that these laws fall into the category of state civil and regulatory laws that may not be enforced on Indian lands.

During trial, after hearing conflicting testimony, the Court invited counsel and Amicus to identify, through the filing of written trial briefs, the "applicable governmental codes, standards and regulations" in effect at the time of the Court's adoption of the Stipulation. From the beginning of this case, the government has urged that Title 25 of California Administrative Code, Division 1, Chapter 2, et seq. ("Title 25"), applies to the mobile homes and mobile home parks on the Torres Martinez Indian Reservation; the Court, based on counsel's stipulation as to its applicability in December, 2008, believed this issue to be resolved.

However, the Court's analysis in its summary judgment concerning California nuisance law, coupled with further briefing by the parties, has convinced the Court that, although there is no question that the government and a Native American allottee **can** agree to apply Title 25 through the leasing process, **absent** a provision in an approved lease or some other agreement, Title 25 does not apply to Indian land through its own force, a point of law seemingly recognized by most of the witnesses at trial. As pointed out by Amicus in their brief, in 1965, the Secretary of the Interior purported to adopt and make applicable California land use laws to Indian reservations in the State. 25 CFR § 1.4(b); Notice, Dep't of the Interior, 30 Fed. Reg. 8722 (July 9, 1965). However, the Secretary's directive was subsequently clarified to limit the regulation to use as standards for the Bureau of Indian Affairs ("BIA") to follow in approving leases of Indian land. *See Administrative Appeal of the Morongo Band of Mission Indians v. Area Director, Sacramento Area Office*, 86 Interior Dec. 680, 689–90, 1979 WL 34250 at *7 (Dec. 13, 1979). Moreover, the Supreme Court in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), nullified this attempt, holding unequivocally that only Congress could authorize state jurisdiction over Indian lands and that Congress had not done so in Public Law 280. Thus, at the time the Stipulation was negotiated, executed by the parties, and adopted by the Court, Title 25 was **not** applicable to the Park.

Not only was Title 25 not applicable, the Court finds that there is simply no evidence in the record to support a finding that there was any intention or a meeting of the minds on the part of the parties *at the time of the settlement agreement,* to

rely on or otherwise incorporate Title 25 into the Stipulation.

Absent such evidence, the Court considers the only regulatory law that could have applied to the mobile homes and mobile home parks at issue in this case—Tribal Ordinances. The testimony at trial indicated that the only applicable Tribal ordinances operative at the time of the Stipulation, applied the Uniform Building Code, National Electric Code, and Uniform Plumbing Code to all physical structures on the Torres Martinez reservation. Moreover, the undisputed evidence at trial established that the Uniform Building Code is not applicable to manufactured housing (with the exception of load requirements for foundations), and there was insufficient evidence adduced at trial specific to violations of the National Electric Code and Uniform Plumbing Code.

In the absence of any clearly understood "applicable governmental codes, standards and regulations" by which to measure compliance, all that is left is whether or not Mr. Duro complied with the provisions of the contract that required his submission of a lease. Unfortunately, those provisions set forth in the Stipulation are hopelessly ambiguous and confusing, calling for the BIA to submit to Mr. Duro a proposed lease for his signature, not the other way around. It is entirely unclear, in light of the absence of any applicable standards, what precisely Mr. Duro could possibly have done—or what he agreed to do—to comply with the lease provisions of the Stipulation. Thus, the Court **VACATES** its findings in its earlier order regarding summary judgment concerning the breach of the Stipulation, and instead **DISMISSES** with prejudice the government's first cause of action.

Notwithstanding the foregoing, the Court finds, as a matter of law, that the creation and operation of the defendant Desert Mobilehome Park, aka Duroville, by defendant Harvey Duro, Sr., and others, was accomplished and sustained in violation of federal law requiring a lease approved by the Secretary of the Interior. Although Mr. Duro, as a Native American allottee, and his family, has every right to occupy his allotment of land without interference from either the federal or state governments, if and when he decides to create and operate a residential and/or business operation on said allotment he must first obtain a lease approved by the Secretary of Interior. This he has failed to do, an omission which violates the requirements of 25 U.S.C. § 415.

## II. FINDINGS AND CONCLUSIONS AS TO RESPONSIBILITY

■ Not only did Mr. Duro violate the law, the Court finds his creation and expansion of the Park in violation of the law was both knowing and willful. Mr. Duro's testimony at trial clearly established that he was familiar with the requirements of 25 C.F.R Part 162—the regulation which spells out the lease requirements—and actually referred to the 25 C.F.R regulations as the "bible" of the BIA. Mr. Duro's military experience in the United States Army, his work experience with the City of Banning Water Department, his public service on the Tribal Council and as a former Chairman of his Tribe all reveal an individual who is both intelligent and sophisticated enough to understand the significance of the regulations and the obligation to comply with their requirements. It is clear from his demeanor and testimony at trial that he purposely neglected his legal obligations and was not interested in compliance, failing to seek appropriate advice from the BIA and other government officials and failing to meet with the BIA when requested to do so in September of 1999. For these reasons, as well as the

reasons previously articulated by the Court, the Court has enjoined Mr. Duro from profiting from his unlawful residential and business operation; has turned over operation of the park to a receiver; has ordered and facilitated the removal of virtually all non-residential operations from the Park; has precluded any replacement residents; and has encouraged, in the strongest terms possible, relocation of existing residents as soon as possible.

Although Mr. Duro is primarily responsible for creating and operating this unlawful residential and business operation, the BIA shares in this responsibility. The Court begins with the fundamental principal that the BIA has a fiduciary relationship with the Native Americans for whom they oversee the Indian reservation land that the American government holds in trust. The Supreme Court has consistently recognized the undisputed existence of a general trust relationship between the United States and the Native American people. This Court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). This principle has long dominated the Government's dealings with Native Americans. *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Minnesota v. United States,* 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235 (1939); *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831). To be clear, the BIA owes a fiduciary obligation to Harvey Duro, Sr.; conversely, Harvey Duro, Sr. does not owe a fiduciary obligation to the BIA.

The clear and convincing evidence revealed that not only did the BIA do little to assist or provide pertinent information or assistance to Mr. Duro—even when such information, such as that gained through the various inspections conducted by the government, was important for the health, safety and welfare of the residents of the park—it appears to the Court that the BIA actually attempted to obstruct Mr. Duro's efforts to commercially develop his allotment. From the initial response of "good luck" to the selective prosecution of the park (singling out the Park for civil prosecution when there are other parks that are both older or larger in size; neglecting the park for literally years at a time (both before and after the 2003 litigation); the failure to provide Mr. Duro with appellate rights after denying the lease; and an attitude that borders on an adverse predisposition if not an outright animus towards Mr. Duro by the BIA Superintendent who oversees the Torres Martinez reservation and 29 other reservations in southern California.

Although this neglect of the government's fiduciary duty, which takes the form of the Superintendent's apparent reticence to approving any lease proposed for the Park, is of great concern to the Court in and of itself, of greater concern still is the Superintendent's complete lack of understanding of the criteria necessary for the approval of the lease which he repeatedly denied. The July 25, 2000, letter regarding the auto lot at the Park did not address any requirements concerning the mobilehome park, and thereafter there was no substantive contact with Mr. Duro until shortly before the 2003 lawsuit was filed when the BIA provided the March 6, 2003, cease-and-desist letter. Throughout this time, despite the government's fiduciary duty, the BIA did not provide Mr. Duro with any substantive information of what was needed to bring his park into compliance such that it might qualify for a lease.

Since the settlement of the 2003 lawsuit, the BIA appears to have adopted nothing more—and nothing less—than a prosecutive demeanor. Although the testimony of one of the Leasing Compliance Officers convinced the Court that the three separate denials of the lease were not completely arbitrary, she did little to assure the Court that the BIA actively engaged with Mr. Duro in a good faith effort to help him commercially utilize his allotment—as the BIA is required to do pursuant to its fiduciary obligations. Moreover, that neither the business lease checklist nor the leasing procedures manual (the validity of which is in question) were never provided to Mr. Duro—or even, apparently, to counsel in this litigation—is illustrative of the failure for the BIA to comply with even the most rudimentary elements of due process.

The testimony and evidence at trial clearly reveals that the BIA, in meeting with county and federal officials to discuss the situation at the Park, the only focus was on closure and relocation, never on rehabilitation. The BIA throughout this litigation has appeared anxious to apply the regulatory aspects of Title 25, but not its rehabilatory, assistive, or procedural aspects. Although defendants did not bring a counterclaim for breach of fiduciary duty, the BIA's conduct from the genesis of the Park is certainly one factor that the Court will consider in determining the equitable relief to be afforded the government.

## III. THE CHALLENGE PRESENTED

The challenge for the Court is determining what remedy to apply. The situation at the Park is unique. Contrary to the government's suggestion—and now Mr. Duro's position in the month leading up to trial—this Court cannot simply wave a magic wand and make this challenge disappear. As much as the government urges the Court to deal with the Park as the Court previously dealt with other business operations on the Torres Martinez Indian Reservation (such as the Lawson toxic dump that was located next door to the Park, which the Court ordered closed in August, 2006, or even the various non-residential business operations on the Park itself, which the Court similarly directed to be shut down), and as much as Harvey Duro, being primarily responsible for creating this crisis situation, now wants to, as he testified at trial, "throw in the towel" and have it all go away—such a remedy in this case is unacceptable.

There is no question that the Park is unsafe and unhealthy. In ruling on the government's motion for a preliminary injunction, the Court found on February 11, 2008, that the "park is being operated in an illegal, unsafe, and unhealthy manner . . . and that continued operation in its present state constitutes an immediate risk to [the] health and safety of the residents [of the park.]" Based on the evidence at trial, the Court, in large measure, reaffirms this finding. Although significant improvements have been made under the stewardship of the Provisional Receiver, Mr. Mark Adams, the Court-approved property manager Thomas J. Flynn, and Interim Receiver, Duroville Renaissance Corporation, significant health and safety threats remain. Even the expert witness called by the Intervenors stated that there are "serious hazards" that "need to be corrected." Most significant amongst these concerns is fire safety. However, the Court also finds that, based on the evidence at trial, certain measures can be taken that can further significantly reduce many (but not all) of the most pressing and imminent health and safety concerns, as set forth below.

The Park, or Duroville or Los Duros, as it is better known by its residents, is not a business, it is a village; thousands of our fellow human beings call the Park home. It is not nearly as safe or as healthy as we would want it to be; it is, nonetheless, home for a community of people who are poor, undereducated, disenfranchised, and, in many respects, exploited. The Court must also add that, despite these disadvantages, these very same people, based on the evidence at trial, are an honest, hardworking, proud, colorful, and family-oriented community of people committed to educating their children and raising them to be productive and successful members of our society. The evidence at trial indicates that some are undocumented, some are resident aliens, and some are United States citizens; this complicated combination of immigration statuses places many of the residents of the Park in the crossroads of our Nation's incongruous immigration and agricultural policies that, on the one hand, portend that undocumented workers lack legal status while at the same time predicating the economic efficiency of an agricultural industry on their hard work; it appears to this Court that we have, once again, established a rather "peculiar institution" to service our agrarian needs.

In any event, the evidence at trial clearly established that to accede to the government's—and now Mr. Duro's—request to promptly close the Park, without identify-

ing where the vast majority of its residents would then live, would create a *major humanitarian crisis.* For the Court to close the Park under current conditions would create one of the largest forced human migrations in the history of this State. Unlike another forced migration in this State's history—the internment of Japanese citizens during World War II—there is not even a Manzanar for these residents to go.[1] The Court, since the early hearings in this case, has pressed the government to identify and present relocation proposals for the residents of the Park. Although the Court recognizes and applauds the efforts of various government actors, including the United States Attorney himself, to explore potential alternatives, and although the County of Riverside, under the leadership of Supervisor Roy Wilson and his colleagues, and with the support of Senators Dianne Feinstein and Barbara Boxer, have together made significant strides in developing and funding potential alternatives, the evidence at trial clearly establishes that any such alternatives are many months, and perhaps several years, away. Moreover, any of the proposed alternatives are further complicated by the immigration issue referenced above. As unsafe and unhealthy as the Park may be—circumstances the Court has observed first-hand through its visits to the park—it nonetheless offers a shelter in place for a people who otherwise have nowhere to go. *Until and unless alternative housing is*

---

**1.** Counsel's concerns about the safety and health conditions at the Park are well taken; however, without any available alternative, counsel's implicit assumption that a forced closure and relocation out of the Park—presumably employing United States Marshals to compel those who refused to move—would somehow result in the residents landing in either a safer or healthier location is not only speculative but is, based on the evidence admitted at trial, highly unlikely. The closure sought by the government, in the manner it is

sought, is qualitatively different than the forced relocation and internment of Japanese Americans during World War II in that it does not represent in a deprivation of one's treasured liberty; nevertheless, the parallel between the Court-sanctioned, forced relocation of thousands of vulnerable individuals during a sad chapter in our nation's history, and the remedy sought by the government in this case, especially when viewed in the context of the precarious immigration status of so many of the residents of the Park, is striking.

*available—alternative housing that is safe, healthy, affordable and truly available to the residents—this Court will not close Duroville.*

Moreover, the evidence at trial indicates that Mr. Duro does not have the financial ability to restore the Park to the pre-park condition. Not only does Mr. Duro lack the financial resources for a safe restoration, the Court has no confidence, for many of the reasons set forth above, that he would do so in a safe manner. The government seeks an Order of money damages for the cost of closing the Park and restoring the land to its original condition, but it is clear that Mr. Duro has no such money. Because the Court at present will not close the Park for the reasons identified above, an award of such money is premature.

These are the challenges of the Park and of this case. Having prevailed on its second claim for failure to obtain an approved lease, the government is entitled to a remedy, which they seek in equity and at law; the Court must therefore fashion a just and equitable remedy that recognizes and accounts for four fundamental findings and conclusions by this Court, which are based on the undisputed evidence considered in the Court's summary judgment ruling and the clear and convincing evidence adduced at this trial: (1) The commercial mobile home park on its allotment to Harvey Duro, Sr., is unlawful; (2) despite recent efforts, the mobile home park is unsafe and unhealthy; (3) despite recent efforts, there is no presently available relocation facilities for the vast majority of the residents of the Park; and (4) immediate closure of the Park under current circumstances would create an unacceptable humanitarian crisis for thousands of people.

## IV. THE REMEDY

The evidence at trial established that the health and safety crisis at the Park results from three primary factors— the strain of overcrowding, the inadequacy of the Park's infrastructure, and the poor condition of many of the Park's mobile homes. The evidence supports that addressing the first factor (overcrowding) *may* provide the opportunity and ease the process of addressing the latter two (inadequate infrastructure and poorly equipped mobile homes). Moreover, significantly reducing the Park's overcrowding while repairing the Park's infrastructure and mobile homes *may* provide an opportunity for Mr. Duro to satisfy the legitimate requirements necessary, in the properly exercised discretion of the BIA, to obtain a lease to operate a commercial mobile home park if, and only if, that is what Mr. Duro wants to do with his allotment.

In the interim, because the commercial operation of a mobile home park and related businesses on the allotment is unlawful, relocation of the residents of the Park must proceed with all deliberate speed, but in a manner that does not engender a greater health, safety, or cultural crisis than the one that currently exists at the Park. Therefore, the Court **ENCOURAGES** the Torres Martinez Cahuilla Band of Indians, the County of Riverside, under the good leadership of Supervisor Roy Wilson and his colleagues, the offices of Senators Dianne Feinstein and Barbara Boxer, the office of Governor Arnold Schwarzenegger, the Office of Social Concerns of the Diocese of San Bernardino, including Sister Gabi and her Dominican Sisters, the United States Attorney, and all other governmental and non-governmental organizations who have been and wish to be involved in resolving this crisis to continue their efforts to develop safe, healthy, affordable, and available housing for the residents of the Park (not to mention the residents of the numerous other sub-stan-

dard mobile home parks referenced at trial). Ultimately, neither the politics of fear nor the politics of hope will resolve this issue; rather, a bi-partisan commitment to addressing all of the related issues raised by this case is necessary. Such a political question is, as it should be, well beyond the purview of this Court.

Because operation of the mobile home park by Mr. Duro under the current circumstances is, for the reasons set forth above, both unlawful and impractical, and because the evidence at trial indicates that no safe, healthy, affordable and available housing for the residents of the Park will be available for at least 18 to 24 months, the Court exercises its equitable power to appoint a Receiver to administer and manage and park for two years. Having consulted *in camera* with the parties, the Court has ascertained that all of the parties and Amicus agree that Thomas J. Flynn has served as a suitable property manager during the periods of time that Duroville Renaissance Corporation served as the Court-approved property manager and as Interim Receiver. Accordingly, for good cause, the Court **APPOINTS** Thomas J. Flynn as Receiver, for a term of two years from the date of the entry of this Order, with the following powers:

1. The Receiver shall assume control as property manager of the Park with exclusive authority to control the property, books, records, rent and utility receipts, finances and vehicles thereof (provided such vehicles are properly insured), as well as exclusive authority to initiate eviction proceedings as detailed below. No rent shall be collected from Harvey Duro, Sr., or his immediate family.

2. The Receiver shall have full and complete authority to enter the Park without interference by any person, including but not limited to any of the parties to this litigation. The Receiver shall secure the financial books and records of the Park and shall have exclusive control of the building in which such books are records are maintained. The Receiver is afforded leave to request this Court to direct the United States Marshals to secure compliance if needed.

3. The Receiver shall submit a monthly report to the Court, served on all parties of record of this case, setting forth all income and expenses for the preceding month. The first monthly report, which shall be for the time period of May 1, 2009, to May 31, 2009, must be filed no later than June 15, 2009. Subsequent monthly reports shall also be filed no later than the 15th of each month. The Receiver shall also submit quarterly reports setting forth all accounts receivable and all accounts payable. The Receiver is also directed to immediately report to the Court and counsel for all parties of record any emergencies that develop at the Park.

4. The Receiver shall conduct any and all administrative, safety, and code inspections of the Park that he deems necessary, and may employ consultants to assist in such inspects as he further deems necessary; the Receiver shall have authority to enter into any building, mobile home, or other structure with reasonable notice to the occupants to conduct such inspections. Such inspections may be conducted solely for the purpose of the present action and may not be used in any criminal or immigration proceedings.

5. The Receiver may authorize any needed repairs, reconstruction, or rehabilitation which he, in his discretion, deems necessary to protect against a threat to the health or safety of any person on the Park.

6. The Receiver shall be paid the costs and reasonable fees for his professional services, as well as the costs and reasonable fees of any professionals that, in his discretion, he hires to fulfill his obligations under this Order, including professionally certified accountants and counsel, in no event to exceed $15,000 per month.

To address the most pressing health and safety concerns at the Park, the Court **ORDERS** the Receiver to oversee and implement the following measures as soon as possible:

1. Encourage park residents to relocate to safe, healthy, affordable and available housing. Specifically, the Receiver shall assist in identifying and providing information concerning any federal, county, or private alternative housing that might be appropriate for current park residents, including Riverside County's DHAP program and Mountain View Estates program, or any other program that may become available, and encourage park residents to add their names to any appropriate application and/or waiting lists for such alternative housing;

2. Establish and enforce a one-way road system with appropriate signage;

3. Identify any sewage, water, and/or propane gas leaks on or adjacent to any mobile homes and direct the motor coach owner responsible for the leaks to remedy the leaks, including raising the sewage infra-structure to offset grading deficiencies;

4. Enforce Court's order of December 18, 2008, to secure propane outside the mobile home and further direct residents to secure said propane tanks on a stable surface with appropriate strapping and secure valves;

5. Identify any exposed electrical wiring on any mobile homes and direct the mobile home owner to neutralize, cover, or replace said wiring;

6. Complete fencing around all sewage ponds and any debris;

7. Negotiate with prospective Laundromat operator to provide sanitary clothes washing facility on the Park premises;

8. Negotiate with electrical utility provider to restore electricity and satisfy outstanding electrical bills;

9. Remove the accumulated pile of debris along the south side of park; continue to work with volunteers from the United States Marine Corps and other volunteers to safely and lawfully remove and dispose of said debris;

10. Ensure that all collected garbage is properly covered and contained and direct all Park residents to cover and contain all garbage pending pick up;

11. Direct park residents to tag their dogs and clean up after their dogs;

12. Instruct and direct park residents on repair of stairs and rails leading into and out of all mobile homes;

13. Cooperate with volunteer organizations that can assist with spaying and neutering canines;

14. Cooperate with vector control officials to ensure adequate vector control;

15. Cooperate with any available charitable and religious volunteer organizations to assist in and organize repairs and rehabilitation efforts as well as counseling for those residents undergoing relocation.

Once the immediate concerns identified above are addressed, the Receiver is **DIRECTED** to address, as feasible, other inadequacies of the Park's infrastructure and the Park's mobile homes, including its fire suppression system, electrical system, sewer system, water system, and grading. In this regard, an adequate fire suppression system shall be the highest priority. The Receiver is authorized and encouraged to pursue fulfillment, to the extent feasible and conditioned upon cooperation from Mr. Duro, the BIA, and other interested parties, of the twenty-one conditions set forth in the Court's May 1, 2008, Order. In addition, the Receiver is directed to work with EPA officials in developing an appropriate Environmental Assessment and insure that the Park fulfills its obligations regarding arsenic compliance consistent with the terms of the Memorandum of Understanding with the EPA.

Until and unless a lease is approved by the BIA, **IT IS ORDERED** that no new or replacement tenants and no new or replacement non-residential businesses, except as expressly set forth above, shall be permitted inside the Park.

**IT IS FURTHER ORDERED** that any resident of the Park who fails to pay reasonable rent or utilities due and owing or who otherwise fails to abide by any lawful order of this Court, including its prior orders concerning the removal of any unlawful wooden structures and repositioning of propane tanks outside of all structures, shall be made subject to an order to show cause, as issued by this Court by and through its appointed Receiver, as to why the resident should not be evicted. The Receiver will in the first instance resolve (or attempt to resolve) any disputes concerning rent or utilities; failing such resolution, the matter may be referred to this Court which will either decide the matter itself, refer it to a Magistrate Judge, or, if a mechanism is put in place, to an appropriate Tribal adjudicative body for resolution. This paragraph does not apply to Mr. Duro or his immediate family.

Recognizing the special relationship between the United States and Native Americans, and mindful of the fiduciary obligation owed by the BIA to Native Americans, the Court **FURTHER ORDERS** that, following a six-month cooling-off period, defendant Harvey Duro, Sr., and his counsel of record participate in a settlement conference with the BIA and counsel for the government before this Court or a Magistrate Judge as designated by this Court to explore future options related to Mr. Duro's allotment. In the interim, in the interest of justice, the Court **ORDERS** that Mr. Duro be paid $2,000.00 per month from the rent proceeds collected at the Park.

## V. STUDY GROUP AND RECEIVERSHIP ACCOUNTING ISSUES

In its Order dated May 23, 2008, the Court directed that Mr. Duro pay for the Court-appointed Study Group for their professional services rendered; specifically, the Court directed Mr. Duro to pay $62,000 to Ambassador Prosper, $36, 00 to Jack Shine, and $122,000 to Mark Adams. In March, 2008, Mr. Mark Adams obtained a $220,000 line of credit from CDFI, secured personally, to pay for the Court-appointed Study Group. According to Mr. Adams' accounting, $31,125 has been paid to Mr. Shine, $16,665 was paid to Ambas-

sador Prosper, and $122, 00 was paid to Mr. Adams. Accordingly, Mr. Shine is owed $5,375, and Ambassador Prosper is owed $46,279.44. It is clear from the evidence at trial that, at present, Mr. Duro is unable to pay the principal of the CDFI line of credit. In the interest of justice the Court **ORDERS** that the interest on that loan, approximately $1,600 per month, be paid from the rent proceeds collected at the Park. The Court affords leave to any party of record to object to this portion of this Order within ten days of the entry of this Order. This Order does not in any way affect any other financial obligations that Mr. Duro voluntarily incurred either before or during the period of this litigation.

Mr. Adams has indicated to the Court that he believes that he is owed additional sums for the period of May 23, 2008, through the present. Without deciding the issue, the Court affords Mr. Adams ten days' leave to file an application for an award of such monies. If Mr. Adams submits such an application, any party of record may file any objections to such application within ten days of its filing, and the Court will, as it deems appropriate, either set a hearing thereon or take the matter under submission and issue a written Order.

**IT IS SO ORDERED.**