Justice Sotomayor,
dissenting.
Federal Indian policy, as established by a network of federal statutes, requires the United States to act strictly in a fiduciary capacity when managing Indian trust fund accounts. The interests of the Federal Government as trustee and the Jicarilla Apache Nation (Nation) as beneficiary are thus entirely aligned in the context of Indian trust fund management. Where, as here, the governing statutory scheme establishes a conventional fiduciary relationship, the Government’s duties include fiduciary obligations derived from common-law trust principles. Because the common-law rationales for the fiduciary exception fully support its application in this context, I would hold that the Government may not rely on the attorney-client privilege to withhold from the Nation communications between the Government and its attorneys relating to trust fund management.
The Court’s decision to the contrary rests on false factual and legal premises and deprives the Nation and other Indian tribes of highly relevant evidence in scores of pending cases seeking relief for the Government’s alleged mismanagement of their trust funds. But perhaps more troubling is the majority’s disregard of our settled precedent that looks to common-law trust principles to define the scope of the Government’s fiduciary obligations to Indian tribes. Indeed, as *189 pects of the majority’s opinion suggest that common-law principles have little or no relevance in the Indian trust context, a position this Court rejected long ago. Although today’s holding pertains only to a narrow evidentiary issue, I fear the upshot of the majority’s opinion may well be a further dilution of the Government’s fiduciary obligations that will have broader negative repercussions for the relationship between the United States and Indian tribes.
I
A
Federal Rule of Evidence 501 provides in relevant part that “the privilege of a... government... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.” Rule 501 “was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them.” United States v. Weber Aircraft Corp., 465 U. S. 792, 804, n. 25 (1984).
As the majority notes, the purpose of the attorney-client privilege “is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.” Upjohn Co. v. United States, 449 U. S. 383, 389 (1981). But the majority neglects to explain that the privilege is a limited exception to the usual rules of evidence requiring full disclosure of relevant information. See 8 J. Wigmore, Evidence §2192, p. 64 (3d ed. 1940) (common law recognizes “fundamental maxim that the public . . . has a right to every man’s evidence” and that “any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule”). Because it “has the effect of withholding relevant information from the fact-finder,” courts construe the privilege narrowly. Fisher v. United States, 425 U. S. 391, 403 (1976). It applies “only *190 where necessary to achieve its purpose,” ibid.; “[wjhere this purpose ends, so too does the protection of the privilege,” Wachtel v. Health Net, Inc., 482 F. 3d 225, 231 (CA3 2007).
The fiduciary exception to the attorney-client privilege has its roots in 19th-century English common-law cases holding that, “when a trustee obtained legal advice relating to his administration of the trust, and not in anticipation of adversarial legal proceedings against him, the beneficiaries of the trust had the right to the production of that advice.” Ibid. (collecting cases). The fiduciary exception is now well recognized in the jurisprudence of both federal and state courts,[1] and has been applied in a wide variety of contexts, including in litigation involving common-law trusts, see, e. g., Riggs Nat. Bank of Washington, D. C. v. Zimmer, 355 A. 2d 709 (Del. Ch. 1976), disputes between corporations and shareholders, see, e. g., Garner v. Wolfinbarger, 430 F. 2d 1093 (CA5 1970), and Employee Retirement Income Security Act of 1974 enforcement actions, see, e. g., United States v. Doe, 162 F. 3d 554 (CA9 1999).
The majority correctly identifies the two rationales courts have articulated for applying the fiduciary exception, ante, at 172-173, but its description of those rationales omits a number of important points. With regard to the first rationale, courts have characterized the trust beneficiary as the “real client” of legal advice relating to trust administration because such advice, provided to a trustee to assist in his management of the trust, is ultimately for the benefit of the trust *191 beneficiary, rather than for the trustee in his personal capacity. See, e. g., United States v. Mett, 178 F. 3d 1058, 1063 (CA9 1999) (“ ‘[A]s a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served’ ” (quoting United States v. Evans, 796 F. 2d 264, 266 (CA9 1986) (per curiam))); Riggs, 355 A. 2d, at 713 (same). The majority places heavy emphasis on the source of payment for the legal advice, see ante, at 172, 179, but it is well settled that who pays for the legal advice, although “potentially relevant,” “is not determinative in resolving issues of privilege.” Restatement (Third) of Trusts §82, Comment/, p. 188 (2005) (hereinafter Third Restatement). Instead, the linchpin of the “real client” inquiry is the identity of the ultimate beneficiary of the legal advice. See Wachtel, 482 F. 3d, at 232 (“[0]f central importance . . . [i]s the fiduciary’s lack of a legitimate personal interest in the legal advice obtained”). If the advice was rendered for the benefit of the beneficiary and not for the trustee in any personal capacity, the “real client” of the advice is the beneficiary.
As to the second rationale for the fiduciary exception— rooted in the trustee’s fiduciary duty to disclose all information related to trust management — the majority glosses over the fact that this duty of disclosure is designed “to enable the beneficiary to prevent or redress a breach of trust and otherwise to enforce his or her rights under the trust.” Third Restatement § 82, Comment a(2), at 184. As the leading American case on the fiduciary exception explains, “[i]n order for the beneficiaries to hold the trustee to the proper standards of care and honesty and procure for themselves the benefits to which they are entitled, their knowledge of the affairs and mechanics of the trust management is crucial.” Riggs, 355 A. 2d, at 712. Courts justifying the fiduciary exception under this rationale have thus concluded that “[t]he policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is . . . ultimately more *192 important than the protection of the trustees’ confidence in the attorney for the trust.’’ Id., at 714; see Mett, 178 P. 3d, at 1063 (under this rationale, “the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle”). The majority fails to appreciate the important oversight and accountability interests that underlie this rationale for the fiduciary exception, or explain why they operate with any less force in the Indian trust context.
B
The question in this case is whether the fiduciary exception applies in the Indian trust context such that the Government may not rely on the attorney-client privilege to withhold from the Nation communications between the Government and its attorneys relating to the administration of the Nation’s trust fund accounts. Answering that question requires a proper understanding of the nature of the Government’s trust relationship with Indian tribes, particularly with regard to its management of Indian trust funds.
Since 1831, this Court has recognized the existence of a general trust relationship between the United States and Indian tribes. See Cherokee Nation v. Georgia, 5 Pet. 1, 17 (1831) (Marshall, C. J.). Our decisions over the past century have repeatedly reaffirmed this “distinctive obligation of trust incumbent upon the Government” in its dealings with Indians. Seminole Nation v. United States, 316 U. S. 286, 296 (1942); see United States v. Mitchell, 463 U. S. 206, 225-226 (1983) (Mitchell II) (collecting cases and noting “the undisputed existence of a general trust relationship between the United States and the Indian people”). Congress, too, has recognized the general trust relationship between the United States and Indian tribes. Indeed, “[njearly every piece of modern legislation dealing with Indian tribes contains a statement reaffirming the trust relationship between tribes and the federal government.” F. Cohen, Handbook of *193 Federal Indian Law § 5.04[4][a], pp. 420-421 (2005 ed.) (hereinafter Cohen).[2]
Against this backdrop, Congress has enacted federal statutes that “define the contours of the United States’ fiduciary responsibilities” with regard to. its management of Indian tribal property and other trust assets. Mitchell II, 463 U. S., at 224. The Nation’s claims as relevant in this case concern the Government’s alleged mismanagement of its tribal trust fund accounts. See ante, at 167.
The system of trusteeship and federal management of Indian funds originated with congressional enactments in the 19th century directing the Government to hold and manage Indian tribal funds in trust. See, e. g., Act of Jan. 9, 1837, 5 Stat. 135; see also Misplaced Trust: The Bureau of Indian Affairs’ Mismanagement of the Indian Trust Fund, H. R. Rep. No. 102-499, p. 6 (1992) (hereinafter Misplaced Trust). Through these and later congressional enactments, the United St,ates has come to manage almost $3 billion in tribal funds and collects close to $380 million per year on behalf of tribes. Cohen § 5.03[3][b], at 407.[3]
*194 Today, numerous statutes outline the Federal Goverm ment’s obligations as trustee in managing Indian trust funds. In particular, the Secretary of the Treasury, at the request of the Secretary of the Interior, must invest “[a]ll funds held in trust by the United States ... to the credit of Indian tribes” in certain securities “suitable to the needs of the fund involved.” 25 U. S. C. § 161a(a). The Secretary of the Interior rnay deposit irt the Treasury and pay mandatory interest on Indian trust, funds when “the best interests of the Indians will be promoted by such deposits, in lieu of investments.” § 161. Similarly, the Secretary of the Interior may invest tribal trust funds in certain public debt instruments “if he deems it advisable and for the best interest of the Indians.” § 162a(a). And Congress has set forth a nonexhaustive list of the Secretary of the Interior’s “trust responsibilities” with respect to Indian trust funds, which include a series of accounting, auditing, management, and disclosure obligations. §162a(d). These and other statutory provisions[4] give the United States “full responsibility to manage Indian [trust fund accounts] for the benefit of the Indians.” Mitchell II, 463 U. S., at 224.
“[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over [trust assets] belonging to Indians.” Id., at 225. Under the statutory regime described above, the Government has extensive managerial control over Indian trust funds, exercises considerable discretion with respect to their investment, and has assumed significant responsibilities to account to the tribal beneficiaries. As a result, “[a]ll of the necessary elements of a common-law trust are present: a trustee (the United *195 States), a beneficiary (the Indian [Tribe]), and a trust corpus (Indian . . . funds).” Ibid. Unlike in other contexts where the statutory scheme creates only a "bare trust” entailing only limited responsibilities, United States v. Navajo Nation, 537 U. S. 488, 505 (2003) (Navajo I) (internal quotation marks omitted),[5] the statutory regime governing the United States’ obligations with regard to Indian trust funds “bears the hallmarks of a conventional fiduciary relationship,” United States v. Navajo Nation, 556 U. S. 287, 301 (2009) (Navajo II) (internal quotation marks omitted); see Lincoln v. Vigil, 508 U. S. 182, 194 (1993) (“[T]he law is 'well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity* ” (quoting United States v. Cherokee Nation of Okla., 480 U. S. 700, 707 (1987))).
H-i
In light of Federal Rule of Evidence 501 and the Government’s role as a conventional fiduciary in managing Indian trust fund accounts, I would hold as a matter of federal common law that the fiduciary exception is applicable in the Indian trust context, and thus the Government may not rely *196 on the attorney-client privilege to withhold communications related to trust management. As explained below, the twin rationales for the fiduciary exception fully support its application in this context. The majority’s conclusion to the contrary rests on flawed factual and legal premises.
A
When the Government seeks legal advice from a Government attorney on matters relating to the management of the Nation’s trust funds, the “real client” of that advice for purposes of the fiduciary exception is the Nation, not the Government. The majority’s rejection of that conclusion is premised on its erroneous view that the Government, in managing the Nation’s trust funds, “has its own independent interest in the implementation of federal Indian policy” that diverges from the interest of the Nation as beneficiary. Ante, at 181; see also ante, at 187 (Ginsbukg, J., concurring in judgment).
The majority correctly notes that, as a general matter, the Government has sovereign interests in managing Indian trusts that distinguish it from a private trustee. See, e. g., United States v. Minnesota, 270 U. S. 181, 194 (1926). Throughout the history of the Federal Government’s dealings with Indian tribes, Congress has altered and administered the trust relationship “as an instrument of federal policy.” Ante, at 181, n. 8 (detailing shifts in policy); see generally Cobell v. Norton, 240 F. 3d 1081, 1086-1088 (CADC 2001) (same, and describing that history as “contentious and tragic”).
In the specific context of Indian trust fund management, however, federal Indian policy entirely aligns the interests of the Government as trustee and the Indian tribe as beneficiary. As explained above, Congress has enacted an extensive network of statutes regulating the Government’s management of Indian trust fund accounts. That statutory framework establishes a “conventional fiduciary relation *197 ship” in the context of Indian trust fund administration. Navajo II, 556 U. S., at 301 (internal quotation marks omitted); see supra, at 194-195.
As a conventional fiduciary, the Government’s management of Indian trust funds must “be judged by the most exacting fiduciary standards.” Seminole Nation, 316 U. S., at 296-297. Among the most fundamental fiduciary obligations of a trustee is “to administer the trust solely in the interest of the beneficiaries.” 2A A. Scott & W. Fratcher, Law of Trusts § 170, p. 311 (4th ed. 1987); see Meinhard v. Salmon, 249 N. Y. 458, 464, 164 N. E. 545, 546 (1928) (Cardozo, C. J.) (“Not honesty alone, but the punctilio of an honor the most sensitive,” is “the standard of behavior” for trustees “bound by fiduciary ties”). Although Indian trust funds are deposited in the United States Treasury, “they are not part of the federal government’s general funds and can be used only for the benefit of the tribe.” Cohen § 5.03[3][b], at 408, and n. 140 (citing Quick Bear v. Leupp, 210 U. S. 50, 80-81 (1908)).
Because federal Indian policy requires the Government to act strictly as a conventional fiduciary in managing the Nation’s trust funds, the Government acts in a “representative” rather than “persona[l]” capacity when managing the Nation’s trust funds. Riggs, 355 A. 2d, at 713. By law, the Government cannot pursue any “independent” interest, ante, at 181, distinct from its responsibilities as a fiduciary. See Cohen § 5.03[3][b], at 408, and n. 141 (“Federal statutes forbid use of Indian tribal funds in any manner not authorized by treaty or express provisions of law” (citing 25 U. S. C. §§ 122, 123)). In other words, any uniquely sovereign interest the Government may have in other contexts of its trust relationship with Indian tribes does not exist in the specific context of Indian trust fund administration. It naturally follows, then, that when the Government seeks legal advice from Government attorneys relating to the management of the Nation’s trust funds, the “real client” of the advice for *198 purposes of the fiduciary exception is the Nation, not the Government.
This conclusion holds true even though Government attorneys are “paid out of congressional appropriations at no cost to the [Nation].” Ante, at 179. As noted above, although the source of funding for legal advice may be relevant, the ultimate inquiry is for whose benefit the legal advice was rendered. See supra, at 191. And, for all the emphasis the majority places on the funding source here, see ante, at 172, 179, the majority never suggests that the fiduciary exception would apply if Congress amended federal law to permit Indian tribes to pay Government attorneys out of their own trust funds.[6]
The majority also suggests that, even if the interests of the United States and Indian tribes may be equivalent in some contexts, that “equivalence” “breaks down” when there are “multiple interests” involved in a trust relationship. Ante, at 182. According to the majority, “the Government has too many competing legal concerns to allow a case-by-case inquiry into the purpose of each communication.” Ibid. As a result, the majority concludes that the fiduciary exception should not be applied at all in the Indian trust context. Ibid.
Preliminarily, while the Government in certain circumstances may have sovereign obligations that conflict with its duties as a fiduciary for Indian tribes, see, e. g., Nevada v. United States, 463 U. S. 110 (1983),[7] the existence of compet *199 ing interests is not unique to the Government as trustee. Indeed, the issue of competing interests arises frequently in the private trust context. See, e. g., Third Restatement § 78, Comment c, at 97-103 (describing duties of trustee with respect to “transactions that involve conflicting fiduciary and personal interests”); id., §79, Comment b, at 128-129 (describing trustee’s duty of impartiality in “balancing ... competing interests” of multiple beneficiaries). In such circumstances, “a trustee — and ultimately a court — may need to provide some response that offers a compromise between the confidentiality or privacy concerns of some and the interest-protection needs of others.” Id., §82, Comment j; at 188. The majority provides no reason why federal courts applying the fiduciary exception in the Indian trust context could not similarly adopt a workable framework that adequately takes into account any unique governmental interests that bear on the application of the fiduciary exception in any given circumstance. See Fed. Rule Civ. Proc. 26(b)(2)(C) (authorizing courts to set limits on discovery based on equitable concerns).
The majority’s categorical rejection of the fiduciary exception in the Indian trust context sweeps far broader than necessary. This case involves only the Government’s alleged *200 mismanagement of the Nation’s trust fund accounts, and the Government did not claim below that the attorney-client communications at issue relate to any competing governmental obligations. See App. to Pet. for Cert. 18a~19a. To the extent the United States in other contexts has competing interests, the Government and its attorneys already have to identify those interests in determining how to balance them against their obligations to Indian tribes, and attorney-client communications relating to those interests may properly be withheld or redacted consistent with application of the fiduciary exception. See 88 Fed. Cl. 1,18 (2009) (observing that redactions “allo[w] the privilege and exception to reign supreme within their respective spheres”).
The majority’s categorical approach fails to appreciate that privilege determinations are by their very nature made on a case-by-case — indeed, document-by-document — basis. Government attorneys, like private counsel, must review each requested document and make an individualized assessment of privilege, and courts reviewing privilege logs and challenges must do the same. <rWhile such a ‘case-by-case’ basis may to some slight extent undermine desirable certainty in the boundaries of the attorney-client privilege, it obeys the spirit of” of Rule 501, Upjohn, 449 U. S., at 396-397, which “ ‘provide[s] the courts with the flexibility to develop rules of privilege on a case-by-case basis,’” Trammel v. United States, 445 U. S. 40, 47 (1980) (quoting 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate)); see S. Rep. No. 93-1277, p. 13 (1974) (“[T]he recognition of a privilege based on a confidential relationship . .. should be determined on a case-by-case basis”).
Rather than fashioning a blanket rule against application of the fiduciary exception in the Indian trust context, I would, consistent with Rule 501 and principles of judicial restraint, decide the question solely on the facts before us. See Upjohn, 449 U. S., at 386 (noting that “we sit to decide concrete cases and not abstract propositions of law” and “de- *201 dinting] to lay down a broad rule or series of rules to govern all conceivable future questions in this area”). On those facts, the fiduciary exception applies to the communications in this case.
B
Like the “real client” rationale, the second rationale for the fiduciary exception, rooted in a trustee’s fiduciary duty to disclose all matters relevant to trust administration to the beneficiary, fully supports disclosure of the communications in this case. As explained above, courts relying on this second rationale have recognized that “[t]he policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is ... ultimately more important than the protection of the trustees’ confidence in the attorney for the trust.” Riggs, 355 A. 2d, at 714. Because the statutory scheme requires the Government to act as a conventional fiduciary in managing the Nation’s trust funds, the Government’s fiduciary duty to keep the Nation informed of matters relating to trust administration includes the concomitant duly to disclose attorney-client communications relating to trust fund management. See Third Restatement § 82, Comment f at 187-188; Restatement of the Law (Third) Governing Lawyers § 84, pp. 627-628 (1998).
Notably, the majority does not suggest that the Nation needs less information than a private beneficiary to exercise effective oversight over the Government as trustee. Instead, the majority contends that the Nation is entitled to less disclosure because the Government’s disclosure obligations are more limited than a private trustee. In particular, the majority states that the Government “assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute,” and thus the Nation “must point to a right conferred by statute or regulation in order to obtain otherwise privileged information from the Government against its wishes.” Ante, at 178. The majority cites a single statutory provision and its implementing regulations *202 as “defining] the Government’s disclosure obligation to the [Nation].” Ante, at 185; see ante, at 184-185 (citing 25 U.S.C. § 162a(d)(5) and 25 CFR §§115.801-115.803 (2010)). Because those “narrowly defined disclosure obligations” do not provide Indian tribes with a specific statutory right to disclosure of attorney-client communications relating to trust administration, ante, at 186, the majority concludes that the Government has no duty to disclose those communications to the Nation.
The majority’s conclusion employs a fundamentally flawed legal premise. We have never held that all of the Government’s trust responsibilities to Indians must be set forth expressly in a specific statute or regulation. To the contrary, where, as here, the statutory framework establishes that the relationship between the Government and an Indian tribe “bears the hallmarks of a conventional fiduciary relationship,” Navajo II, 556 U. S., at 301 (internal quotation marks omitted), we have consistently looked to general trust principles to flesh out the Government’s fiduciary obligations.
For example, in United States v. White Mountain Apache Tribe, 537 U. S. 465 (2003), we construed a statute that vested the Government with discretionary authority to “use” trust property for certain purposes as imposing a concomitant duty to preserve improvements that had previously been made to the land. Id., at 475 (quoting 74 Stat. 8). Even though the statute did not “expressly subject the Government to duties of management and conservation,” we construed the Government’s obligations under the statute by reference to “elementary trust law,” which “confirm[ed] the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.” 537 U. S., at 475. Similarly, in Seminole Nation, we relied on general trust principles to conclude that the Government had a fiduciary duty to prevent misappropriation of tribal trust funds by corrupt members of a tribe, even *203 though no specific statutory or treaty provision expressly imposed such a duty. See 316 U. S., at 296.[8]
Accordingly, although the “general ‘contours’ of the government’s obligations” are defined by statute, the “interstices must be filled in through reference to general trust law.” Cobell, 240 F, 3d, at 1101 (quoting Mitchell II, 463 U. S., at 224). This approach accords with our recognition in other trust contexts that “the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime.” Varity Corp. v. Howe, 516 U. S. 489, 504 (1996) (emphasis deleted); cf. Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U. S. 559, 570 (1985) (“[R]ather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility”). Indeed, “[i]f the fiduciary duty applied to nothing more than activities already con *204 trolled by other specific legal duties, it would serve no purpose.” Howe, 516 U. S., at 504.
The majority pays lipservice to these precedents, acknowledging that “[w]e have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed.” Ante, at 177. But despite its assurance that it “will apply common-law trust principles where Congress has indicated it is appropriate to do so,” ante, at 178, the majority inexplicably rejects the application of common-law trust principles in this case. In doing so, the majority states that “[t]he common law of trusts does not override the specific trust-creating statute and regulations that apply here.” Ante, at 185 (referring to § 162a(d)(5) and 25 CFR §§ 115.801-115.803). That statement evidences the majority’s fundamental misunderstanding of the way in which common-law principles operate in the context of a conventional fiduciary relationship.
Contrary to the majority’s view, the Government’s disclosure obligations are not limited solely to the “narrowly defined disclosure obligations” set forth in § 162a(d)(5) and its implementing regulations, ante, at 186; rather, given that the statutory regime requires the Government to act as a conventional fiduciary in managing Indian trust funds, the Government’s disclosure obligations include those of a fiduciary under common-law trust principles. See supra, at 202-204. Instead of “overrid[ing]” the specific disclosure duty set forth in § 162a(d)(5) and its implementing regulations, general trust principles flesh out the Government’s disclosure obligations under the broader statutory regime, consistent with its role as a conventional fiduciary in this context.
This conclusion, moreover, is supported by the plain text of the very statute cited by the majority. Section 162a(d), which was enacted as part of the American Indian Trust Fund Management Reform Act of 1994 (1994 Act), 108 Stat. 4239, sets forth eight “trust responsibilities of the United States.” But that provision also specifically states that the *205 Secretary of the Interior’s “proper discharge of the trust responsibilities of the United States shall include (but are not limited to)” those specified duties. 25 U. S. C. § 162a(d) (emphasis added). By expressly including the italicized language, Congress recognized that the Government has preexisting trust responsibilities that arise out of the broader statutory scheme governing the management of Indian trust funds.[9] Indeed, Title I of the 1994 Act is entitled “Recognition of Trust Responsibility,” 108 Stat. 4240 (emphasis added), and courts have similarly observed that the 1994 Act “recognized and reaffirmed . . . that the government has longstanding and substantial trust obligations to Indians.” Cobell, 240 F. 3d, at 1098; see also H. R. Rep. No. 103-778, p. 9 (1994) (“The responsibility for management of Indian Trust Funds by the [Government] has been determined through a series o.f court decisions, treaties, and statutes”). That conclusion accords with common sense as not even the Government argues that it had no disclosure obligations with respect to Indian trust funds prior to the enactment of the 1994 Act.[10]
*206 The majority requires the Nation to “point to a right-conferred by statute” to the attorney-client communications at issue, ante, at 178, and finding none, denies the Nation access to those communications. The upshot of that decision, I fear, may very well be to reinvigorate the position of the dissenting Justices in White Mountain Apache and Mitchell II, who rejected the use of common-law principles to inform the scope of the Government's fiduciary obligations to Indian tribes. See White Mountain Apache, 537 U. S., at 486-487 (Thomas, J., dissenting); Mitchell II, 463 U. S., at 234-235 (Powell, J., dissenting). That approach was wrong when Mitchell II was decided nearly 30 years ago, and it is wrong today. Under our governing precedents, common-law trust principles play an important role in defining the Government’s fiduciary duties where, as here, the statutory scheme establishes a conventional fiduciary relationship. Applying those principles in this context, I would hold that the fiduciary exception is fully applicable to the communications in this case.[11]
*207 hH I — I V-H
We have described the Federal Government’s fiduciary duties toward Indian tribes as consisting of “moral obligations of the highest responsibility and trust,” to be fulfilled through conduct “judged by the most exacting fiduciary standards.” Seminole Nation, 316 U. S., at 297; see also Mitchell II, 463 U. S., at 225-226 (collecting cases). The sad and well-documented truth, however, is that the Government has failed to live up to its fiduciary obligations in managing Indian trust fund accounts. See, e. g., Cobell, 240 F. 3d, at 1089 (“The General Accounting Office, Interior Department Inspector General, and Office of Management and Budget, among others, have all condemned the mismanagement of [Indian] trust accounts over the past twenty years”); Misplaced Trust 8 (“[T]he [Government’s] indifferent supervision and control of the Indian trust funds has consistently resulted in a failure to exercise its responsibility and [to *208 meet] any reasonable expectations of the tribal and individual accountholders, Congress, and taxpayers”); id., at 56 (“[H]ad this type of mismanagement taken place in any other trust arrangements such as Social Security, there would be war”).
As Congress has recognized, “[t]he Indian trust fund is more than balance sheets and accounting procedures. These moneys a,re crncial to the daily operations of native American tribes and a source of income to tens of thousands of native Americans.” Id., at 5. Given the history of governmental mismanagement of Indian trust funds, application of the fiduciary exception is, if anything, even more important in this context than in the private trustee context. The majority’s refusal to apply the fiduciary exception in this case deprives the Nation — as well as the Indian tribes in the more than 90 cases currently pending in the federal courts involving claims of tribal trust mismanagement, App. to Pet. for Cert. 126a-138a — of highly relevant information going directly to the merits of whether the Government properly fulfilled its fiduciary duties. Its holding only further exacerbates the concerns expressed by many about the lack of adequate oversight and accountability that has marked the Government’s handling of Indian trust fund accounts for decades.
But perhaps even more troubling than the majority’s refusal to apply the fiduciary exception in this case is its disregard of our established precedents that affirm the central role that common-law trust principles play in defining the Government’s fiduciary obligations to Indian tribes. By rejecting the Nation’s claim on the ground that it fails to identify a specific statutory right to the communications at issue, the majority effectively embraces an approach espoused by prior dissents that rejects the role of common-law principles altogether in the Indian trust context. Its decision to do so in a case involving only a narrow evidentiary issue is wholly unnecessary and, worse yet, risks further diluting the Government’s fiduciary obligations in a manner that Congress *209 clearly did not intend and that would inflict serious harm on the already-frayed relationship between the United States and Indian tribes. Because there is no warrant in precedent or reason for reaching that result, I respectfully dissent.

 See, e. g., Solis v. Food Employers Labor Relations Assn., 644 F. 3d 221, 224-225 (CA4 2011); Wachtel v. Health Net, Inc., 482 F. 3d 225, 232-234 (CA3 2007); Bland v. Fiatallis North America, Inc., 401 F. 3d 779, 787-788 (CA7 2005); United States v. Mett, 178 F. 3d 1058, 1062-1064 (CA9 1999); In re Long Island Lighting Co., 129 F. 3d 268, 271-272 (CA2 1997); Wildbur v. ARCO Chemical Co., 974 F. 2d 631, 645 (CA5 1992); Fausek v. White, 965 F. 2d 126, 132-133 (CA6 1992); see also Restatement (Third) of Trusts §82, Comment/and Reporter’s Notes on §82, pp. 187-188, 198-204 (2005); Restatement of Law (Third) Governing Lawyers § 84 (1998).

 See, e. g., 25 U. S. C. §458ce(a) (directing Secretary of the Interior to enter into funding agreements with Indian tribes “in a manner consistent with the Federal Government's lawc and tract relationohip to and respon sibility for the Indian people”); §3701 (finding that the Government "han a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes”); 20 U, S. C. § 7401 (“It is the policy of the United States to fulfill the Federal Government’s unique and continuing trust relationohip with and reeponsibility to the Indian people for the cdu cation of Indian children”).

 Tract fund aeeounto are “comprioed mainly of money received through the oalo or leaoe of trust lands and include timber stumpage, oil and gao royalties, and agriculture fees,” as well as “judgment funds awarded to tribes.” H. R. Rep. No. 103-778, p. 9 (1994). The Nation’s claims involve proceeds derived from the Government’s management of the Nation's timber, gravel, and other resources and lcaseo of rcGcrvation lando. The Gov ernment has held theoe fundo in truot for the Nation oineo the late 1880’a, See App. to Pet. for Cert. 98a-100a, 105a.

 See, e. g., 25 U. S. C. § 4011(a) (requiring Secretary of the Interior to account ‘Tor the daily and annual balance of all funds hold in truot by the Uniled States for the benefit of an Indian tribe”); §4041(1) (creating the Office of Special Trastee for American Indians “to provide for more effective management of, and accountability for the proper discharge of, the Secretary’s trust responsibilities to Indian tribes”).

 For example, in United States v. Mitchell, 445 U. S. 535 (1980) (Mitchell I), this Court held that a federal statute which authorized the President to allot a specified number of acres to individual Indians residing on reservation lands did not “provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands.” Id., at 542. Under the statute, “the Indian allottee, and not a representative of the United States, is responsible for using the land for agricultural or grazing purposes.” Id., at 542-543. Accordingly, we concluded that Congress did not intend to “impose upon the Government all fiduciary duties ordinarily placed by equity upon a trustee” because the statute “created only a limited trust relationship between the United States and the allot-tee.” Id., at 542; see also Navajo I, 537 U. S., at 507-508 (concluding that Secretary of the Interior did not assume “fiduciary duties” under the relevant statutory schome because “[t]hc Secretary io neither assigned a comprehensive managerial role nor ... expressly invested with responsibility to secure the needs and best interests of the Indian owner and his heirs” (internal quotation marks omitted)).

 Tho majority also states that ownership of the requested documents is “a significant factor” in deciding whether the fiduciary exception applies, ante, at 186, but the only case it cites as support deals with the source of payment for the legal advice, not the ownership of the documents. See ibid, (citing Riggs Nat. Bank of Washington, D. C. v. Zimmer, 355 A. 2d 709, 712 (Del. Ch. 1976)).

 In Nevada, the Government represented certain tribes in litigation involving water rights even though it was also required by statute to represent the water rights of a reclamation project. See 463 U. S., at 128 (noting that Congress delegated to the Secretary of the Interior “both the *199 responsibility for the supervision of the Indian tribes and tho commonco ment of reclamation projects in areas adjacent to reservation lands”). Because of this dual litigating responsibility, we noted that “it is simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obliged it to represent other interests as well.” Ibid. We thus observed in the context of that ease that “the Government cannot follow the fastidious standards of a private fiduciary, who would breach hio dutico to hio cinglo bonoficiory solely by representing potentially conflicting interests without the benefit ciar/s consent.” Ibid. We expressly distinguished the context “where only a relationship between the Government and the tribe is involved.” Id., at 142. In that context, we acknowledged that “the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States.” Ibid.

To bo cure, in decisions involving the juriodiction of the Court of Fed eral Claims under the Tucker Act, we have explained that the jurisdictional analyoio “muot train on opccific rights-creating or duty imposing statutory or regulatory prescriptions.” Navajo I, 537 U. S., at 506. But oven assuming, arguendo, that those jurisdictional decisions have relevance here, they do not otand for the propooition that the Governments fiduciary duties are defined exclusively by express statutory provisions. Indeed, thoGC dccioiono relied specifically on general trust principles to determine whether the relevant otatutory ócheme permitted a damagee remedy, a prerequisite for jurisdiction under the Tucker Act. See, e. g., Mitchell II, 463 U. S., at 226 (noting that common-law trust sources establish that “a trustee is accountable in damages for breaches of trust” and that, “[gjiven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties”); see also Navajo II, 55C U. S., at 301 (affirming that general “trust principles . . . could play a role in inferring that the trust obligation is enforceable by damages” (internal quotation marks and brackets omitted)).

 Tbe majority invokes the canon against superfluity and argues that tbe “catchall" phrase (by which it means the “shall include (but are not limited to)” language) cannot be read to “include a general common law duty to disclose all information related to the adminiotration of Indian trusts” be eauoo doing co would “impose general obligations that would include thooc specifically enumerated.” Ante, at 185. But the flaw in the majority’s argument is that it miopcrccivce the function of tho relevant language. Rather than serving as a “catchall” provision that affirmatively “incor-póratela]” common-law trust duties into §162a(d), ibid., that language simply malees clear that § 162a(d) does not cot forth an exhaustive list of the Government’s trust responsibilities in managing Indian trust funds; nothing in that language itself imports any substantive obligations into the statute.

 Tbe majority also contends that, its reading of §1.62a(d) is supported by a provision in the Indian Claims Limitation Act of 1982 (ICLA), 96 Stat. 1976, which provided that if the Secretary of the Interior rejected a claim for litigation by an Indian claimant, he was required to provide upon request “any nonprivileged research materials or evidence gathered by *206 the United States in the documentation of such claim,” § 5(b), id., at 1978. According to the majority, this provision reflected Congress’ understanding that “the Government retains evidentiary privileges allowing it to withhold information related to trust property from Indian tribes.” Ante, at 186, n. 10. But this provision cannot bear the weight the majority places on it. Even putting aside the undisputed fact that the ICLA is inapplicable to the claims in this ease, the majority’s reliance on the ICLA provision fails to recognize that documento oubjeet to the fiduciary exception aro, undor the “real client” rationale, por oo nonprivileged. See, a. g., Mett, 178 F. 3d, at 1063. Accordingly, if anything, the ICLA’s requirement that tho Governmont disclose “nonprivileged” materials to Indian claimants supports the conclusion that Congress intended communications related to trust fund management to be disclosed to Indian tribes.

 Tho majority’s errors are further compounded by its failure to accord propor consideration to the mandamus posture of this case. ‘‘This Court ropoatodly has observed that the writ of mandamus Í3 an extraordinary remedy, to be reserved for extraordinary situations.” Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U. S. 271, 289 (1988). “As the writ is ono of the moot potent weapons in the judicial arsenal, three conditions *207 must be satisfied before it may issue,” Cheney v. United States Dist. Court for D. C., 642 U. S. 367, 880 (2004) (internal quotation marks and citation omitted):
“First, the party seoking issuance of the writ must have no other adc quato moans to attain the relief he desires a condition designed to ensure that tho writ mil not be used as a substituto for the regular appeals proc. ess. Socond, tho potitionor must satisfy tho burden of showing that his right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the excrcioc of its discretion, must be satisfied that the writ is appropriate under the circumstances.” Id., at 380-381 (internal quotation marks and citations omitted; alterations deleted).
Tho majority purports to leave the decision whether to grant mandamus roliof to tho Federal Circuit, but simultaneously drops a footnote stating that it “assumefs]” that the Court of Federal Claims on remand will “follow [its] holding” that the fiduciary exception io inapplicable here. Ante, at 187, and n. 12. By doing so, the majority virtually ensures that the Na tion will not bo ablo to use tho communications at issue in thio litigation, theroby effectively granting extraordinary relief to the Government upon no showing whatsoever that the stringent conditions for mandamus have been met.